1   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com (Lead Counsel)
3   ASHLEY PEARSON (S.B. #281223)
      apearson@omm.com
4   O'MELVENY & MYERS LLP
5   1999 Avenue of the Stars, 7th Floor
    Los Angeles, CA  90067-6035
6   Telephone:   (310) 553-6700
    Facsimile:    (310) 246-6779
7

8   Attorneys for Defendants
    Warner Bros. Studio Enterprises Inc.,
9   The Malpaso Company, Inc., Warner Bros.
    Distributing Inc., Warner Bros. Home
10  Entertainment Inc., Warner Communications
    Inc., TW UK Holdings Inc., Robert Lorenz,
11  Michele Weisler, and Randy Brown

12                **UNITED STATES DISTRICT COURT**

13               **CENTRAL DISTRICT OF CALIFORNIA**

14

15  GOLD GLOVE PRODUCTIONS,            Case No.  CV13-07247-DSF (RZx)
    LLC, a California Limited Liability
16  Company and RYAN A. BROOKS, an     **WARNER DEFENDANTS' NOTICE
    individual,                        OF MOTION AND MOTION TO
17                                      STRIKE PLAINTIFFS' ASSERTED
              Plaintiffs,               "EXPERT" TESTIMONY**
18
         v.                            FILED HEREWITH:  DECLARATION
19                                      OF ASHLEY PEARSON; REQUEST
    DON HANDFIELD, an individual,       FOR JUDICIAL NOTICE;
20  TRESSA DIFIGLIA HANDFIELD, an      [PROPOSED] ORDER
    individual, RANDY BROWN, an
21  individual, MICHELE WEISLER, an    The Hon. Dale S. Fischer
    individual, CHARLES FERRARO, an
22  individual, JAY COHEN, an individual, **Hearing Date:** February 24, 2014
    ROBERT LORENZ, an individual,      **Hearing Time:** 1:30 p.m.
23  UNITED TALENT AGENCY, INC., a      **Courtroom:**    840
    California corporation, THE GERSH
24  AGENCY, a California corporation,
    WARNER BROS. PICTURES INC., a
25  Delaware corporation, MALPASO
    PRODUCTIONS, LTD., a California
26  corporation, WARNER BROS.
    DISTRIBUTING INC., a Delaware
27  corporation, WARNER BROS. HOME
    ENTERTAINMENT INC., a Delaware
28  corporation, WARNER BROS.
    DOMESTIC TELEVISION

1   DISTRIBUTION, INC., a Delaware
    corporation, TW UK HOLDINGS,
2   INC., a Delaware corporation, and
    DOES 1-10, inclusive
3
                    Defendants.
4

5   _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on February 24, 2014, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled court, located in Courtroom 840 at 255 East Temple Street, Los Angeles, California 90012, defendants Warner Bros. Studio Enterprises Inc., Warner Bros. Distributing Inc., Warner Bros. Home Entertainment Inc., Warner Communications Inc., TW UK Holdings Inc., The Malpaso Company, Inc., Randy Brown, Michele Weisler, and Robert Lorenz (collectively, the "Warner Defendants"[1]) will and hereby do move to exclude the putative "expert" opinions (and any argument based thereon) of Richard Walter, Sheril Antonio, David Yerkes, Tal Smith, Gerald Hunsicker, and Trevor Reschke, which Plaintiffs Ryan Brooks and Gold Glove Productions, LLC ("Plaintiffs") have submitted in this case at, *e.g.*, Docket Nos. 66 at 2-7, 13-23; 66-4; 66-5; 71; 73; 74; 77; 96 at 8-20; 93 at 1-50; 106-1 ¶¶ 24-72.

This motion is made pursuant to Rule 702 of the Federal Rules of Civil Procedure, as well as numerous cases rejecting such opinion testimony in similar copyright cases. *See, e.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003); *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010). It is made following the conference of counsel pursuant to Central District Local Rule 7-3 and the Court's Standing Order, Docket No. 6 at 7. *See* Decl. of Ashley Pearson ("Pearson Decl.") Ex. AA.

The Court need not grant this motion to strike in order to grant the Warner Defendants' pending motions for summary judgment. *See* Docket Nos. 98; 109.

This motion to strike is based on this Notice of Motion and accompanying Memorandum of Points and Authorities; the concurrently filed Pearson

---

[1] Plaintiffs' complaint erroneously names three of the nine Warner Defendants. It names defendant Warner Bros. Studio Enterprises Inc. as "Warner Bros. Pictures Inc."; Warner Communications Inc. as "Warner Bros. Domestic Television Distribution, Inc."; and The Malpaso Company, Inc. as "Malpaso Productions, Ltd." *See* Docket Nos. 1; 28; 45 at 2.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1  Declaration; the concurrently filed Request for Judicial Notice; the other records on

2  file in this matter; and such additional submissions and argument, including any

3  reply, as may be presented at or before the hearing on this motion.

4  Dated:  January 8, 2014                              Respectfully submitted,

5                                                       O'MELVENY & MYERS LLP

6                                                       By:  /s/ Ashley Pearson

7                                                            Ashley Pearson
                                                        Counsel for Warner Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WARNER DEFS.' MOT. TO
                                                        STRIKE EXPERT OPINIONS

1

# TABLE OF CONTENTS

2

PAGE

3
I.      INTRODUCTION ............................................................................ 1

4
II.     LEGAL BACKGROUND ................................................................ 1

5
        A.      The General Rules Governing Expert Testimony ................. 1

6
        B.      Additional Rules Specific to Copyright Cases Like This One ............. 2

7
III.    PLAINTIFFS' "SIMILARITY" EXPERTS SHOULD BE

8
        EXCLUDED. ............................................................................... 3

9
        A.      Walter's Declaration Is Inadmissible. .................................... 3

10
        B.      Antonio's Declaration and Report Are Inadmissible. ........... 10

11
        C.      Yerkes' Declaration and Report Are Inadmissible. .............. 15

12
IV.     PLAINTIFFS' "BASEBALL" EXPERTS SHOULD BE EXCLUDED ...... 20

13
V.      PLAINTIFFS' "FORENSIC" EXPERT SHOULD BE EXCLUDED. ........ 22

14
VI.     CONCLUSION ............................................................................ 24

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.,*
   514 F. Supp. 2d 571 (S.D.N.Y. 2007) .........................................................8, 9, 14

*Benay v. Warner Bros. Entm't, Inc.,*
   607 F.3d 620 (9th Cir. 2010) ................................................................................5

*Bernal v. Paradigm Talent & Literary Agency,*
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) .........................................................3, 17

*Cabrera v. Cordis Corp.,*
   134 F.3d 1418 (9th Cir. 1998) ............................................................................16

*Chiate v. Morris,*
   1992 WL 197591 (9th Cir. Aug. 17, 1992) .......................................................22

*Christie v. Harris,*
   47 F. Supp. 39 (S.D.N.Y. 1942) ........................................................................17

*Corwin v. Walter Disney World Co.,*
   475 F.3d 1239 (11th Cir. 2007) ......................................................................5, 16

*Cottrill v. Spears,*
   87 Fed. Appx. 803 (3d Cir. 2004) ...................................................................6, 24

*Daubert v. Merrell Dow Pharm., Inc.,*
   43 F.3d 1311 (9th Cir. 1995) ......................................................................*passim*

*Daubert v. Merrell Dow. Pharm., Inc.,*
   509 U.S. 587 (1993) .........................................................................................1, 2

*Far Out Prods., Inc. v. Oskar,*
   247 F.3d 986 (9th Cir. 2001) ...............................................................................7

*Fogerty v. MGM Grp. Hldgs. Corp.,*
   379 F.3d 348 (6th Cir. 2004) ...............................................................................6

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,*
   462 F.3d 1072 (9th Cir. 2006) ..........................................................................4, 8

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) .......................................................................................... 7, 8

*U.S. v. Ginn,*
    87 F.3d 367, 370 (9th Cir. 1996) ........................................................................ 3

*Guidroz-Brault v. Missouri Pac. R.R. Co.,*
    254 F.3d 825 (9th Cir. 2001) ............................................................................. 22

*Henricksen v. ConocoPhillips Co.,*
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........................................................... 2

*Hooper v. Lockheed Martin Corp.,*
    688 F.3d 1037 (9th Cir. 2012) ............................................................................ 3

*In re Rezulin Prods. Liabl. Litlg.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................. 9

*In re Rezulin Prods. Liabl. Litig.,*
    369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................................................. 7

*Interstate Net Bank v. Netbank, Inc.,*
    221 F. Supp. 2d 513 (D.N.J. 2002) .................................................................... 15

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................................................ 1, 2

*LinkCo Inc. v. Fujitsu Ltd.,*
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...................................................... 9

*Litchfield v. Spielberg,*
    736 F.2d 1352 (9th Cir. 1984) ...................................................................... 4, 17

*Louis Vuitton Malletier, Inc., v. Dooney & Bourke, Inc.,*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................... 18, 19, 24

*Lust By and Through Lust v. Merrell Dow Pharm., Inc.,*
    89 F.3d 594 (9th Cir. 1996) .......................................................................... 1, 2

*Malaco Leaf, AB v. Promotion in Motion, Inc.,*
    287 F. Supp. 2d 355 (S.D.N.Y. 2003) ............................................................... 15

*Nichols v. Universal Pictures Corp.,*
    45 F.2d 119 (2d Cir. 1930) ................................................................................. 2

- iii -

*Nimely v. New York,*
    414 F.3d 381 (2d Cir. 2005) ....................................................................... 3

*Olson v. NBC,*
    855 F.2d 1446 (9th Cir. 1988) .............................................................. 5, 17

*People v. Johnson,*
    19 Cal. App. 4th 778 (1993) ..................................................................... 10

*Pipitone v. Biomatrix, Inc.,*
    288 F.3d 239 (5th Cir. 2002) ................................................................... 24

*Price v. Fox Entm't Grp., Inc.,*
    499 F. Supp. 2d 382 (S.D.N.Y. 2007) ................................................... 3, 8

*Rice v. Fox Broad. Co.,*
    330 F.3d 1170 (9th Cir. 2003) ........................................................... 4, 5, 19

*Ruth v. A.O. Smith Corp.,*
    2006 WL 530388 (E.D. Ohio Feb. 27, 2006) ....................................... 22, 23

*RWT Corp. v. Wonderware Corp.,*
    931 F. Supp. 583 (N.D. Ill. 1996) ........................................................... 15

*Selle v. Gibb,*
    567 F. Supp. 1173 (N.D. Ill. 1983), *aff'd* 741 F.2d 896 ....................... *passim*

*Siddiqui v. AG Commc'ns Sys. Corp.,*
    233 Fed. Appx. 610 (9th Cir. 2007) .......................................................... 7

*Silberstein v. Fox Entm't Grp., Inc.,*
    424 F. Supp. 2d 616 (S.D.N.Y. 2004) ..................................................... 18

*Stromback v. New Line Cinema,*
    384 F.3d 283 (6th Cir. 2004) ..................................................................... 3

*U.S. v. Sanchez-Lima,*
    161 F.3d 545 (9th Cir. 1998) ..................................................................... 3

*Von Saher v. Norton Simon Museum of Art,*
    578 F.3d 1016 (9th Cir. 2010) ................................................................. 21

*Waite v. Patch Products, Inc.,*
    12 Fed. Appx. 330 (6th Cir. 2001) ..................................................... 16, 17

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

*Whitehead v. CBS/Viacom, Inc.*,
  315 F. Supp. 2d 1 (D.D.C. 2004) ........................................................ 12

**RULES**

FED. R. EVID. 403 ............................................................................. 23

FED. R. EVID. 702 ..........................................................................*passim*

**OTHER AUTHORITIES**

3 *Federal Rules of Evidence Manual*, § 702-02[3] (Matthew Bender 10th ed.)..... 24

BEN HUR (Metro-Goldwyn-Mayer 1959)................................................. 9

THE GODFATHER (Paramount Pictures 1972) ........................................... 9

M.B. & D. Nimmer, 4 NIMMER ON COPYRIGHT ("NIMMER") §§ 7.16,
  14.10[B][2] (2011) ......................................................................... 5

THE NATURAL (TriStar Pictures 1984) .................................................. 20

STAR WARS: EPISODE IV - A NEW HOPE (Lucasfilm 1977) ...................................... 20

W.F. Patry, 3 PATRY ON COPYRIGHT § 9.43 (2013)................................... 11

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

# I.      INTRODUCTION

The Warner Defendants move to strike the testimony of Plaintiffs' putative "experts" Richard Walter, Sheril Antonio, David Yerkes, Gerald Hunsicker, Tal Smith, and Trevor Reschke.  Their opinion testimony is unreliable and irrelevant, both under the Federal Rules of Evidence and a long line of copyright cases rejecting opinion testimony of this sort.  These cases make clear that the *courts*, and not paid experts, can and should decide whether two fictional works are "similar" as a matter of copyright law.  Plaintiffs cannot meet those legal tests, so they seek to supplant them with new "similarity" tests their experts have coined.  These opinions are void, however, because they are contrary to law.  Also void are the experts' wild claims that every percipient witness in the case is "lying," despite the extensive documentary evidence in support of the percipient's testimony.  Experts cannot testify to percipient facts or credibility issues, especially when, as here, they assiduously ignore all sorts of record evidence that refutes their opinions.

To be very clear, no matter how this motion to strike is resolved, the Warner Defendants' pending motions for summary judgment, Docket Nos. 98, 109, can and should be granted.  Plaintiffs' experts address only a fraction of the evidence that defendants adduced proving that *TWTC* was created years before *Omaha*, and that Plaintiffs' copying claims are barred.  Moreover, no expert can alter the conclusion that, as a matter of clear copyright law, *TWTC* and *Omaha* are not "similar" works.

# II.     LEGAL BACKGROUND

## A.      The General Rules Governing Expert Testimony.

Rule 702 governs expert testimony and instructs courts to act as gatekeepers to exclude unreliable or irrelevant expert opinions.  *See Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 587 (1993).  This "gatekeeping" duty applies to *all* expert testimony—not just scientific testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  A party offering expert opinion must prove it is admissible. *Lust By and Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 596 (9th Cir.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1996).  Expert testimony is admissible only if (1) the expert has "specialized knowledge" that will help the court; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.  *See* FED. R. EVID. 702; *Kumho Tire*, 526 U.S. at 141.

In making the "reliability" determination, courts consider:

- Whether the methodology at issue can be tested;
- Whether the methodology has been subjected to peer review and publication;
- The known potential rate of error in using the methodology; and
- Whether the methodology has been generally accepted in the particular field.

*See Daubert*, 509 U.S. at 593-94; *Kumho Tire Co.*, 526 U.S. at 149-50.  Courts also consider "whether experts are proposing to testify about matters growing naturally and directly out of the research," or "*they have developed their[] opinions expressly for the purpose of testifying*."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (emphasis added).  "Objective proof" of the reliability of a method is *absent* where it is used solely for litigation.  *Id.* at 1317.

Proffered expert testimony must also be "relevant to the task at hand"—or meet what is commonly called the "fit" requirement.  *Id.* at 1315.  Expert opinion that ignores or strays from the record facts must be excluded.  *E.g.*, *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1165 (E.D. Wash. 2009).

**B.    Additional Rules Specific to Copyright Cases Like This One.**

1.  Courts in copyright cases have long held that expert testimony about the "similarity" of two literary works adds little value and thus regularly exclude it.  As Judge Hand held 80 years ago, such testimony "ought not to be allowed" because "it cumbers the case and tends to confusion."  *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 123 (2d Cir. 1930).  Expert testimony is unnecessary to compare literary works because they "are targeted [to] a general audience and deal with subject matter readily understandable by any ordinary person, including the Court."

- 2 -

*Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010).  "Numerous cases have found in favor of defendants on the issue of substantial similarity" despite contrary expert testimony.  *Id.*; *see, e.g.*, *Stromback v. New Line Cinema*, 384 F.3d 283, 295 (6th Cir. 2004).

2.  Experts may not testify to ultimate legal conclusions—including that two works are "substantially" or "strikingly similar."  *E.g.*, *Selle v. Gibb*, 741 F.2d 896, 905 (7th Cir. 1984) (reciting the "magic formula" of "striking similarity" in an expert report is meaningless); *Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382, 387 (S.D.N.Y. 2007) (expert "may not give testimony stating ultimate legal conclusions," *e.g.*, movies "strikingly similar"); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052-53 (9th Cir. 2012).  While courts sometimes bend this rule when faced with "highly complex and technical cases," *Hooper*, 688 F.3d at 1052, this copyright case is *not* such a case, *see Bernal*, 788 F. Supp. 2d at 1062.

3.  Experts may not testify as to whether witnesses have lied, and opinion testimony may not supplant percipient witness testimony of percipient events, such as when a work was created.  *See Selle v. Gibb*, 567 F. Supp. 1173, 1182 (N.D. Ill. 1983), *aff'd* 741 F.2d 896 ("the law does not permit the oath of credible witnesses, testifying to matters within their knowledge, to be disregarded, particularly where lay persons give testimony contradicting existence of the ultimate fact to be inferred from the opinion of an expert"); *U.S. v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998) ("opinion evidence regarding a witness' credibility is inadmissible"); *U.S. v. Ginn*, 87 F.3d 367, 370 (9th Cir. 1996) (expert opinion on credibility of eyewitness testimony inadmissible); *Nimely v. New York*, 414 F.3d 381, 398 (2d Cir. 2005).

As shown below, Plaintiffs' experts violate all of these rules.

## III.   PLAINTIFFS' "SIMILARITY" EXPERTS SHOULD BE EXCLUDED

### A.   Walter's Declaration Is Inadmissible.

1.  *Walter's testimony is not helpful to the Court's "similarity" analysis.*

Plaintiffs proffer the testimony of Richard Walter, a UCLA Film Professor, who

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1    has worked as a paid expert witness for "approximately three decades."  Docket No.

2    73 ¶¶ 2, 8.  In his report, Walter opines that *Omaha* and *TWTC* are "similar" works,

3    *id*. ¶ 9, but that rote legal conclusion is unreliable, irrelevant, and unsupported.

4           To begin, Walter uses no discernible methodology to assess similarity—let

5    alone one that could be replicated or tested for error.  *Cf.* s*upra* at 2.  To assess

6    similarity under the law, one must compare two works from beginning to end,

7    based on objective measures like "plot, themes, dialogue, mood, setting, pace,

8    characters, and sequence of events."  *Funky Films, Inc. v. Time Warner Entm't Co.,*

9    *L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  Walter never examines *Omaha* and

10   *TWTC* on these measures.  Instead, he cherry picks high-level story elements to

11   compare—without explaining his bases for choosing them or why he ignored

12   obvious differences.  And he does nothing to explain how the story of a dying

13   coach leading his team to a College World Series is "virtually identical," Docket

14   No. 73 ¶ 9, to the story of an aging scout's road trip with his daughter.  *Cf.* Pearson

15   Decl. Appendix 1 (comparing each scene in *TWTC* with each scene and *Omaha*).

16          Walter's "subjective and unreliable," *virtual-identity* test, *Litchfield v.*

17   *Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984), is not only undefined; it defies

18   copyright law.  Any proper "similarity" analysis must first filter out all non-

19   protectable story elements, like ideas, themes, *scenes-á-faire*, stock characters,

20   historical facts, and clichéd dialogue.  *E.g.*, *Funky Films, Inc.*, 462 F.3d at 1077;

21   *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003).  Yet, time and again,

22   these are the only similarities—*unprotectable ones*—that Walter cites as proof.  As

23   examples, Walter opines that *TWTC* and *Omaha* are similar because both leading

24   men "are in the final years of a contract with a baseball organization," Docket No.

25   73 ¶¶ 12, 24-27; both works involve a "father-daughter stor[y] . . . set against a

26   baseball backdrop," *id*. ¶ 13; and the lead characters in both works "are cranky and

27   short tempered," smoke cigars, drink scotch, drive classic cars, and eat junk food,

28   *id*. ¶¶ 16, 19.  But as the Ninth Circuit has made clear, such basic story ideas (a

- 4 -

1    father-daughter baseball movie) or stock character traits are not protectable. *See,*

2    *e.g.*, *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624-25 (9th Cir. 2010).

3         Where, as here, "an expert relies on uncopyrightable ideas rather than on

4    expression of those ideas in analyzing alleged copyright infringement, *the report is*

5    *excludable.*" *Corwin v. Walter Disney World Co.,* 475 F.3d 1239, 1250-51 (11th

6    Cir. 2007) (italics added); *accord Rice*, 330 F.3d at 1180 (disregarding expert report

7    that compared unprotectable elements of script and television series). It does not

8    matter how long that list of overlapping features is or how emphatically the expert

9    states his opinions. *Cf. Olson v. NBC*, 855 F.2d 1446, 1450 (9th Cir. 1988) (expert

10    report excluded that included a list and film montage that "in effect compared

11    unprotectable scenes a faire -- that is, stock scenes"). Walter's report is unreliable

12    and can and should be stricken in its entirety on this ground.

13         2. *Walter's Wild Allegations of Fraud Are Legally Barred.* Walter's report

14    should be stricken for another independent reason. Again, acting as an advocate

15    pressing a legal conclusion (rather than a neutral expert), he seeks to stave off the

16    Warner Defendants' summary judgment motion made on prior-creation grounds.

17    He contends that "Defendants' offered evidence of an earlier, independent creation

18    [of *TWTC*] raises issues of credibility . . . ." Docket No. 73 ¶ 10 (emphasis added).

19    But only the Court can determine whether credibility issues remain, *not* Walter.

20    And in any event, the bases for his opinion are unreliable and improper.

21         First, Walter asserts that the fact that Randy Brown did not register his *TWTC*

22    scripts in the 1990s is "a red flag" and "makes it *impossible* to accurately date

23    [*TWTC*'s creation] *free of having to accept testimony of potentially conflicted*

24    *insiders.*" Docket No. 73 ¶ 31 (italics added). This is nonsense. Under the law,

25    Brown had no duty—none—to register his scripts. *See* M.B. & D. Nimmer, 4

26    Nimmer on Copyright ("Nimmer") §§ 7.16, 14.10[B][2] (2011).

27         Moreover, lack of registration does not make it "impossible" to determine, as

28    a matter of law, when Brown created *TWTC*. Five percipient witnesses—including

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

Brown—all swore under oath that Brown created, completed, and sold *TWTC* to the Bubble Factory in the late 1990s.  Docket No. 98 at 4-6, 9-10.  Each witness shared contemporaneous, documentary proof to support this sworn testimony, including:

- multiple hard-copy, dated versions of *TWTC* from the files of Brown's former attorney (Marcy Morris) and from The Bubble Factory, Docket Nos. 101-1 at 15-123, 130-240, 250-369; 103-1 at 70-189;

- dated, electronic versions of *TWTC* scripts from the late 1990s and early 2000s, Docket Nos. 99-1; 104 ¶ 8; 104-1 at 3-4;

- a fax-dated Coverage Report summarizing *TWTC*'s contents as of 1997, Docket No. 101-1 at 124-28;

- multiple letters sent by the Bubble Factory to third parties, in the late 1990s and early 2000s, marketing *TWTC* and describing its contents, Docket No. 101-2 at 374-81; and

- an article published well before this lawsuit, in which Neil Landau (Walter's colleague at UCLA), described his work on *TWTC* with Brown in the 1990s.  Docket No. 100-1 at 235-38.

Even absent such extensive documentary proof, courts regularly rely on prior creation testimony—*even from defendants themselves*—to rule, as a matter of law, that copyright infringement claims are barred.  *E.g.*, *Fogerty v. MGM Grp. Hldgs. Corp.*, 379 F.3d 348, 353 (6th Cir. 2004); *Cottrill v. Spears*, 87 Fed. Appx. 803, 806-07 (3d Cir. 2004); Docket No. 98 at 7-9 (collecting cases).  These cases make clear that a plaintiff cannot rely on expert opinion to cast percipient testimony in doubt.  *E.g.*, *Selle*, 567 F. Supp. at 1182; *Cottrill*, 87 Fed. Appx. at 806 (testimony from expert that it was "technically possible" for defendants to have altered song after hearing plaintiff's song disregarded in light of defendants' testimony that they had not done so).  The case law further holds that experts cannot opine on "credibility" issues.  *See supra* at 3.  And the law makes clear that calling percipient witnesses "conflicted," as Walter does, Docket No. 73 ¶ 31, is meaningless and

1   does *not* create triable fact issues, *e.g.*, *Siddiqui v. AG Commc'ns Sys. Corp.*, 233

2   Fed. Appx. 610, 612-13 (9th Cir. 2007) ("challenges to the weight of the evidence

3   and the credibility and bias of potential witnesses do not create triable issues of fact

4   that would preclude summary judgment"); *Far Out Prods., Inc. v. Oskar*, 247 F.3d

5   986, 997 (9th Cir. 2001) ("party opposing summary judgment may not simply

6   question the credibility of the movant to foreclose summary judgment.").

7        Indeed, the only bias here is Walter's failure (either his own or that of

8   Plaintiffs' counsel) to make sure his opinions "fit" the actual facts of the case.  *Cf.*

9   *Daubert II*, 43 F.3d at 1315.  His report conspicuously elides the five percipient

10   witness declarations above and the contemporaneous record evidence these

11   witnesses authenticated and provided.  That Walter ignored this record evidence

12   means his opinions do not "fit," are unreliable and irrelevant, and must be excluded.

13   *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) (rejecting expert

14   testimony that relied on studies too "dissimilar to the facts presented in this

15   litigation"); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 420-21

16   (S.D.N.Y. 2005).

17        <u>Second</u>, Walter goes on fanciful riffs about how certain draft *TWTC* scripts

18   were written in "reverse order" and how the father-daughter story in *TWTC* was

19   copied from *Omaha*, but then re-written to appear not copied:

- "The scripts offered by Brown appear to have been written in reverse order. These look in many ways to be made after the fact to appear what they are not."  Docket No. 73 ¶ 34.

- "[T]hose who wrote *Trouble with the Curve* were so dedicated to following the same father-daughter story that they have the daughter do the same thing as the daughter in *Omaha* did . . . . "  *Id.* ¶ 21.

- *TWTC* is "copied" from *Omaha* "because in the attempt to replicate the story action of *Omaha* while cloaking it in somewhat modified circumstances, the writers of *Trouble with the Curve* make the daughter a lawyer, as the *Omaha* notes briefly touched upon, but then have to make it believable that the daughter would surrender her potential partnership in order to help her father at a handful of baseball games."  *Id.* ¶ 22.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1    Again, these opinions are complete nonsense.  Both Brown and a computer-

2  forensics expert verified the creation and "saved on" dates of 10 of the 11 draft

3  scripts Walter reviewed—all well pre-date *Omaha*.  Docket No. 99 ¶¶ 7-9; Docket

4  No. 104 ¶ 8.  (The other paper copy script bears a 1998 date and was authenticated

5  by a third-party.  Docket No. 103-1 at 70.)  Every percipient witness in the case,

6  moreover, has denied that Brown or anyone associated with him ever saw or heard

7  of *Omaha* until this lawsuit was filed.  Docket Nos. 99 ¶ 1; 100 ¶ 15; 101 ¶ 16; 102

8  ¶ 9; 103 ¶ 8.  Walter's *ipse dixit* speculations that, despite this evidence, *TWTC* was

9  copied from *Omaha*, or the various draft scripts written" in "reverse order," are

10  based on no objective, reliable expert analysis.  Rather, they are based only on

11  Walter's trust-me-I'm-an-expert assertions, which "cannot be tested …, ha[ve] no

12  known rate of error, and … [are] not subject to any particular standards or

13  controls."  *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 514 F. Supp. 2d 571, 574-

14  77 (S.D.N.Y. 2007); *see Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in either

15  *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

16  evidence that is connected to existing data only by the *ipse dixit* of the expert.").

17    These conclusory assertions are inadmissible in their own right, *see id.*, and

18  are doubly inadmissible here because they do not "fit" to the record facts.  For

19  example, contrary to Walter's conclusory assertion, the daughter in *TWTC* does not

20  "do the same thing" as the daughter in *Omaha*.  Docket No. 73 ¶ 21.  Mickey, in

21  *TWTC*, risks and ultimately abandons her legal career to spend time with her father,

22  help him in his career, and ultimately pursues her passion as a baseball scout.

23  Sandy in *Omaha* is a beleaguered single mother who quits a dead-end job as a

24  bartender and telemarketer—*not* to pursue a career in baseball like her father, but to

25  get a college degree and become a teacher.  *See* Pearson Decl. Appendix 1.

26    These obvious plot and character differences are the very sorts of differences

27  that *preclude* any finding of infringement, *e.g.*, *Funky Films, Inc.*, 462 F.3d at 1078,

28  1081; *Price*, 499 F. Supp. 2d at 388—and yet Walter improperly twists them to

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1  support a claim that defendants' engaged in misconduct.  Such blind advocacy is

2  improper.  *Cf.*, *e.g.*, *LinkCo Inc. v. Fujitsu Ltd.,* 2002 WL 1585551, at *2 (S.D.N.Y.

3  July 16, 2002) (rejecting expert's report that "does no more than counsel will do in

4  argument, *i.e.*, propound a particular interpretation of [defendant's] conduct").

5       Walter attempts to justify his fraud accusations by opining that a daughter's

6  choice to put her career on hold to help her ill father is "[t]he least likely choice the

7  writer can make when trying to create a believable reunion," and thus it must have

8  been copied.  Docket No. 73 ¶ 21.  He, of course, cites no standard with any

9  "known rate of error," *24/7 Records*, 514 F. Supp. 2d at 575, to support this odd

10  (and, frankly, sexist) *ipse dixit* about Mickey and Brown's motivation in creating

11  her, *cf. In re Rezulin Prods. Liabl. Litig.,* 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)

12  ("[i]nferences about the intent or motive of parties . . . lie outside the bounds of

13  expert testimony").

14       No reliable standard to test this asserted opinion exists, for obvious reasons.

15  First, works of fiction often stand out for having characters who make non-obvious

16  choices—think of Medea killing her children.  Second, an adult child abandoning

17  her career to help an infirm parent is hardly unprecedented in life or the arts.  *E.g.*,

18  Pearson Decl. Ex. V (P. Sullivan, *Caring for Aging Parents, Even From a Distance*,

19  N.Y. TIMES, Nov. 19, 2013); *id.* Ex. W (R. Fay, *How Caring for Aging Parents*

20  *Affects a Career*, THE ATLANTIC, Sept. 12, 2013).  Motion pictures have long used

21  this convention.  Two examples:  in *The Godfather*, Michael Corleone abandons his

22  "normal" life as student to join his ailing father and their crime family; in *Ben Hur*,

23  Esther gives up her marriage to stay in Judea and care for her father.  *See* THE

24  GODFATHER (Paramount Pictures 1972); BEN HUR (Metro-Goldwyn-Mayer 1959).

25       But Walter does not concern himself with such real-world or even movie-

26  world precedents.  Instead, he argues Plaintiffs' case—and reveals in blog posts

27  how much he enjoys cases like this and the steep rates he charges to testify.  *See*

28  Pearson Decl. Exs. R (R. Walter, *Monthly Screenwriting Tips - Issue #14* (Sept.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

2011)); S (R. Sangrund, *When Your Expert Witness is a Screenwriter*, THE DENVER BAR ASSOC. (Nov. 2004)).  Walter is an advocate "masquerading as a pundit"; his opinions should be excluded.  *People v. Johnson,* 19 Cal. App. 4th 778, 790 (1993).

### B.    Antonio's Declaration and Report Are Inadmissible.

Sheril Antonio is an Associate Arts Professor in Art and Public Policy at NYU.  Docket No. 74 ¶ 2.  She says she once "served as a film expert in a case," *id.* ¶ 7, but does not claim to have performed any sort of "similarity analysis" before— much less one that scrupulously seeks to compare works from beginning to end, filtering out non-protectable elements, as the law requires.  *See supra* at 3.  Her report is divided into six sections with the following headings, typos included:

- I - A COMPARISON OF THE SCREENPLAYS FOR OMAHA & TROUBLE WITH THE CURVE (AKA TWC)
- II - THE STRIKING SIMILARITIES IN WRITING STYLE:  SIMILARITY IN USING A STYLE ELEMENT THAT REPEAT IN A NOTICABLE PATTERN IN BOTH OMAHA AND TWC
- III - THE UNBELIEVABLE- THINGS THAT DON'T MAKE SENSE:
- IV - SORTING OUT CONFLICTING INFORMATION FROM BROWN STATEMENTS INTERVIEWS AND THE DECLARATION OF RANDY BROWN
- V -  TRACES OF THE DON HANDFIELD STYLE ELEMENTS AND USE OF PROPS IN TWC AND ACROSS ALL OTHER MATERIALS EXAMINED
- VI - EVALUATING THE 10 SCRIPTS, A-J, PREENTED AS DIFFERENT "DRAFTS" OR VERSIONS

Only the first two of these sections attempt to compare *Omaha* and *TWTC*, while the remaining four consist of Antonio's wild speculation about Brown's alleged lies and the Warner Defendants' supposedly fraudulent evidence.  Her report flouts the many rules governing expert evidence and should be stricken.

*1.  Similarity.*  Antonio's first section purporting to compare *Omaha* and *TWTC* is less than a page long and consists of two paragraphs.  Docket No. 96 at 8.  The first paragraph is titled "**THE STRIKINBG [sic] SIMILARITIES: THE OBVIOUS - OBSERVATION OF 'SAME THEMES'**" and consists of a cursory,

WARNER DEFS.' MOT. TO STRIKE EXPERT OPINIONS

1   high-level comparison of squarely unprotectable story ideas.  *Id.*  The allegedly

2   similar "themes" that Antonio identifies are:  (1) "gruff or cranky baseball loving

3   father/daughter relationship, with dead wife/mother which led to or caused rift in

4   relationship"; (2) "father & daughter reconciliation story with aging dad's

5   illness/health issue of some sort, at end of father's career"; (3) "sports/family/life

6   balancing"; and (4) "[n]arrative's 'past' is often retrieved, explained and tied up

7   with use of photographs/videotape/personal belongings/ gravesite."  *Id.*

8        She completely ignores that not *one* of these ideas is subject to copyright

9   protection, *see supra* at 4-5, and she cites no examples of how these ideas are

10  expressed in either script, which is all that copyright law protects, *see id.*  She also

11  gets the facts wrong—the rift in Coach Dodge's and Sandy's relationship in *Omaha*

12  was the result of Sandy sleeping with one of Coach's players, Docket No. 97 at

13  417, and the rift in Mickey and Gus' relationship in *TWTC*, although related to her

14  mother's death, was caused by Gus sending Mickey away after she was almost

15  molested while on a road trip with him, Docket No. 60 at 01:27:02-01:32:04.[2]

16       Antonio then lists "ideas and words" from a *Omaha* synopsis—like "'This is

17  his last chance to do both'" and "In his final season"—and asserts that they "ALSO

18  describe the core story of **Trouble with the Curve**," without any further analysis.

19  Docket No. 96 at 8.  But these random "ideas," *id.*, are only that—unprotectable

20  thoughts that are unprotectable under the law, *see supra* at 4-5.  They are also

21  simply duplicative of the unremarkable observation that both works are father/

22  daughter stories involving sports.  This conclusory, disorganized ¾-of-a-page

23  constitutes Antonio's complete analysis of *Omaha* and *TWTC* as complete works.

24  She identifies no method, no examples, and no protectable expression, and her

25  opinion is entirely "useless."  W.F. Patry, 3 PATRY ON COPYRIGHT § 9.43 (2013).

26

27       [2] Antonio also bizarrely notes that "[r]egarding props, each film script is

28  garnished with older vehicles," but this random observation is unrelated to theme,
    and regardless, is a general and unprotectable element.  Docket No. 96 at 8.

- 11 -

Antonio's second section purports to identify similarities in the writing style of *Omaha* and *TWTC*.  But again, these three pages of "analysis" intersperse claims about allegedly common sentence structure with random notes about story—like sub-heading number 4 ("DINNER FOODS FOR BREAKFAST" appear in both works); sub-heading 5 ("RELATIONSHIP TO A BLACK CHARACTER" shows an "'OPEN' SIDE" to Coach in *Omaha* and Gus in *TWTC*); and sub-heading 6, (both works use "BASEBALL AND 'LIFE' METAPHORS").  Docket No. 96 at 10.  These random, stock, unprotectable story elements have nothing to do with "writing style."  Where Antonio does actually attempt to compare writing styles, she cites one and only one word in common—the word "pissed"—which she claims proves that defendant Don Handfield wrote *TWTC* and *Omaha*.  *Id.* at 10.  She also asserts that both works use "SORT OF A ONE WORD PUNCTUATION."  *Id.* at 9.  She gives no specific examples and never explains how common this sentence structure is in general speech or in screenwriting.  There is no objective basis for her conclusion that this purported commonality is somehow indicative of copying, and under clear copyright case law, such expert testimony that "writing style" is similar cannot possibly support a claim of infringement.  *See, e.g.*, *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 10-11 (D.D.C. 2004).

   *2.  Fraud Claims.*  Two-thirds of Antonio's report is devoted to a subject for which Antonio has no expertise:  judging the truthfulness of Randy Brown and the other Warner Defendants.  Docket No. 96 at 11-20.  Like Walter, Antonio makes wildly improper credibility claims, asserting that "Brown is not being truthful," Docket No. 96 at 20, and that the *TWTC* scripts she reviewed were "made to look a certain way in reaction to the detailed allegations in the complaint," *id.* at 19; *see* Docket No. 74 ¶ 14.  Besides the fact that credibility is an entirely inappropriate subject for expert testimony, *supra* at 3, Antonio offers nothing except random speculation—untied to the actual record facts—to support these claims.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1    In a section titled "**THE UNBELIEVABLE- THINGS THAT DON'T**

2    **MAKE SENSE**," Antonio lists things about *TWTC* that she says are indicia of

3    fraud.  These include notes like "**I FIND IT HARD TO BELIEVE THAT NO**

4    **ONE INFORMED [BROWN] TO REGISTER THE SCRIPT**."  Docket No. 96

5    at 12.  Her comment is entirely irrelevant, as Brown has never claimed this.

6    Moreover, she never explains why a failure to register a script (which is not legally

7    required) equates to fraud.  She also asserts that it is suspect that "so many worked

8    on TWC with Brown," *id*., but identifies just two people who gave Brown notes

9    (defendants Michelle Weisler and Rob Lorenz).  Again, she gives no industry-

10   custom examples (because none exist) why it would be odd for Brown to get

11   comments from many people on a script he worked on for *15 or so years*.

12   Antonio then purports to judge the credibility of two interviews Brown gave

13   to promote *TWTC* in 2012, *id*. at 12-13—an entirely inappropriate expert exercise.

14   *Supra* at 3.  She notes that Brown says in his declaration that he "wrote TWTC in

15   the 1990s," and claims "**THIS MEANS SOME 10+ YEARS BEFORE 2012**."

16   Docket No. 96 at 13.  Again, more nonsense.  "The 1990s" is "**10+**" years before

17   2012, and Brown's statement about his authorship are entirely consistent with the

18   testimony of various third-party witnesses and the extensive documentary evidence

19   they authenticated, Docket No. 98-104—all of which Antonio notably ignores.

20   In the last two sections of her report, Antonio attacks some, but not all, of the

21   draft *TWTC* scripts Brown and third-parties submitted from the 1990s.  She opines

22   that the *TWTC* scripts bears the "fingerprints" of defendant Handfield because they

23   contain elements that appear in other Handfield works, including "**WALLS**

24   **COVERED WITH FAMILY PHOTOS**" and "**OLD VEHICLES**" (none of

25   which are the same model that appear in the Handfield works), and "**SMOKE**

26   **ALARMS**."  Docket No. 96 at 15-16.  But as copyright law and common sense

27   make plain, Handfield does not own a monopoly on these stock items.  Moreover,

28

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1   none of the items is remotely specific enough to identify Handfield as a writer

2   under any proven, reliable, testable methodology, as Rule 702 requires.

3   　　Finally, Antonio claims 10 of *TWTC* drafts she was provided from Brown's

4   floppy disks were forged *after the complaint was filed*, or a year after the movie

5   came out.  Docket No. 96 at 19 (claiming *TWTC* scripts were "**MADE TO LOOK**

6   **A CERTAIN WAY IN REACTION TO THE DETAILED ALLEGATIONS**

7   **IN THE COMPLAINT**").  This unconsidered, irresponsible charge of fraud is

8   based entirely on speculative conclusions about the "feel" of the drafts—she claims

9   "the 'differences' and 'changes' [between drafts] just don't make sense . . . they do

10   not 'feel' like different drafts," and "these scripts just feels like a word game to

11   me," *id.* at 17.  She concludes this analysis as follows:

12   - All this simply strikes me in the reading of them all as a word-puzzle, shifting-sands

13   just throws off page numbers and thus on the surface the material looks very different-

14   UNTIL we check corresponding phrases, dialogue, etc with another draft and see

　　different pages for same dialogue, events and actions - BUT IT IS JUST ON THE

15   SURFACE that it looks like its different.

16   *Id.* at 19.  Such incomprehensible ramblings based "instinct"—which identify no

17   expert method or logic, much less one that meets the *Daubert* test or the copyright

18   case law—are inadmissible.  *24/7 Records, Inc.,* 514 F. Supp. 2d at 576.

19   　　Antonio's only concrete claim is that the scripts must be a fraud because they

20   were not "accompanie[d] by any handwritten notes" or "dated in any way."  Docket

21   No. 74 ¶ 14.  Again, neither of these contentions "fit" the record facts.  The Warner

22   Defendants provided Plaintiffs with multiple *dated* documents, months ago, *e.g.*:

23   　　•　The Bubble Factory drafts of *TWTC*—with *hand-written dates* on the

24   　　　covers and edges.  Docket Nos. 101-1 at 15; 101-2 at 382-84.

25   　　•　The 1997 Coverage Report—which is dated September 14, 1997 on its

26   　　　face and in a fax header, and recounts in detail, as of that date, the

27   　　　contents of the *TWTC* script.  Docket No. 101-1 at 124-29.

28

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1   • Seven dated letters sent by The Bubble Factory to agents, managers, and

2   studios from 1997 to 2001—in which Antonio's now-colleague at NYU

3   (Gerard Boccaccio) seeks to generate interest in *TWTC* and describes its

4   contents.  Docket No. 101-2 at 374-81; Docket No. 98 at 5.

5   • A 1998 hard-copy *TWTC* script from the law firm files of Marcy Morris

6   that is dated on its face—along with a 1998 option agreement for *TWTC*

7   that she negotiated.  Docket No. 103-1 at 70, 370, 241, 246; 101-2 at 372.

8   • And, finally, the 10 electronic versions of *TWTC*, which Antonio

9   reviewed, and forensic expert Scott Cooper dated to specific created and

10   saved-on dates between 1997 and 2003.  Docket Nos. 98 n.4; 104; 104-1.

11   Ignoring all of these record facts, Antonio opines that the proof of fraud is

12   "beyond disturbing" and that Brown is a liar.  Docket No. 96 at 19-20.  Such

13   reckless, incendiary, unconsidered opinions should be stricken—both as irrelevant

14   under the copyright law and as damagingly irresponsible to Brown.

15   **C.     Yerkes' Declaration and Report Are Inadmissible.**

16   David Yerkes is an English and Comparative Literature professor at

17   Colombia University.  Docket No. 77 ¶ 2.  He, too, is a professional expert witness,

18   but usually in trademark cases—where his opinions have been discredited several

19   times for not adhering to the law governing a case or the record facts.  *See Malaco*

20   *Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 372 (S.D.N.Y. 2003);

21   *Interstate Net Bank v. Netbank, Inc.*, 221 F. Supp. 2d 513, 524-25 (D.N.J. 2002);

22   *RWT Corp. v. Wonderware Corp.*, 931 F. Supp. 583, 589 (N.D. Ill. 1996).  Yerkes

23   is not a neutral expert asked to apply methods he usually uses in his field of

24   expertise.  *Cf. supra* at 2.  Rather, when he read news of this lawsuit, Yerkes "called

25   Plaintiff's counsel," Docket No. 66 at 19, and asked for the job, Docket No. 77 ¶ 1.

26   His repetitive, needless opinions about similarity should be stricken, as they, too,

27   bear no relation to the realities of copyright law or this case.

28

- 15 -

1.   Using a purported statistical analysis *rejected* in other copyright cases, *see Waite v. Patch Products, Inc.*, 12 Fed. Appx. 330, 334-35 (6th Cir. 2001), Yerkes compares *TWTC* to *Omaha* and another script written by defendant Handfield (*Touchback*) and asserts that Handfield wrote all three scripts.  Docket No. 77 ¶ 16.  Yerkes provides no identifiable methodology for comparison, and there is no indication that he has done this analysis before, much less that it has been widely accepted.  His analysis should be rejected because it cherry-picks random fragments from the three works and asserts they are similar even when they are not and even though the vast majority of elements are not copyrightable.  In Appendix I, Yerkes lists "details" he deems similar; he arranges the "details" into "sequences"; and he then asserts that the odds that *TWTC* and *Omaha* would share these commonalities absent copying are "5,923,325,956,892,030,528,929,734,656,000,000,000,000--to one."  Docket No. 93 at 24-25.

This is junk science in every sense of the word.  The "details" Yerkes picks—without any verification of the reliability of his selection process, *cf., e.g., Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (expert properly excluded who relied on a testing procedure that could not be replicated)—are not protectable under copyright law, *cf Corwin*, 475 F.3d at 1254 (testimony excluded that did not "explain . . . how, precisely, the expressive effect of [plaintiff's] arrangement is duplicated").  His asserted overlapping "details" are random stage directions like "INT[ERIOR] … ROOM" (ignoring that the two rooms are, in fact, different) and words like "could" and "couldn't" (even when used differently):

| *Omaha* | *Trouble* |
|---|---|
| "**INT.** [...] LOCKER **ROOM**" (page [1]) | "**INT. LIVING ROOM**" (page [1]) |

| *Omaha* | *Trouble* |
|---|---|
| "...have to think about it, Dobbs... **couldn't** start now anyway..." (page [1]) | "... I **could** paint the goddamn house before you decide to cooperate." (page [1]) |

*Id.* at 18, 17.

- 16 -

1    Yerkes then feeds these asserted overlapping "details"—and scores of other

2    non-protecable, non-matching word fragments—into his probability machine to gin

3    up his statistics.  Courts rightly exclude such probability analyses.  *E.g.*, *Waite*, 12

4    Fed. Appx. at 334-35 (plaintiff sought to prove defendant copied word game by

5    using "statistical correlation of selected words common to both games"; court

6    affirmed summary judgment for defendant and rejected statistical study because it

7    included elements of the game that "are not subject to protection under the

8    copyright laws"); *see also Litchfield*, 736 F.2d at 1356 (lists of alleged similarities

9    "inherently subjective and unreliable"); *Christie v. Harris*, 47 F. Supp. 39, 41041

10   (S.D.N.Y. 1942) (lengthy list of asserted "similarities" reflected "plaintiff's

11   ingenuity rather than an actual reflection of reality"); *Olson*, 855 F.2d at 1450

12   (expert who presented a chart and montage excluded because "random" "'lists of

13   similarities' are 'inherently subjective and unreliable'").

14   Worse still are the ways Yerkes mischaracterizes "details" to suit his desired

15   conclusions.  For example, he equates a stage direction in *Omaha* that Coach Dodge

16   looks "Troubled," to Gus' looking "down to the source of his trouble":

| *Omaha* | *Trouble* |
|---|---|
| "He shuts the phone unceremoniously and stares out across the empty field. **Troubled**." (page [1]) | "He's seen and heard it all -- and then some. Looks down to the source of his **trouble**." (page [1]) |

20   *Id.* at 17.  These phrases have obviously different meanings, and yet Yerkes equates

21   these "details" to drive his made-up math.  *Cf. Bernal*, 788 F. Supp. 2d at 1063

22   (expert rejected where he "mischaracterized the events to make the works appear

23   more similar").  He also does nothing to address the *thousands of dissimilarities* in

24   the two works, if one looks at them in the word-by-word detail he employs.  For

25   example, he makes no mention of the fact that in the actual scenes above, Coach

26   Dodge stands on a baseball field, talks on a cell phone, and is then interrupted by

27   his assistant coach, Docket No. 97 at 383; whereas, in *TWTC*, Gus is alone in his

28   home trying to urinate, Docket No. 60 at 00:52-1:10.  Ignoring such obvious

- 17 -                        WARNER DEFS.' MOT. TO
                             STRIKE EXPERT OPINIONS

difference is further grounds to strike Yerkes' analysis.  *E.g., Price*, 499 F. Supp. 2d at 388 (precluding expert testimony where there were "sufficient dissimilarities [between screenplay and movie] that foreclose[d] a finding of striking similarity"); *Louis Vuitton Malletier, Inc., v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 643 (S.D.N.Y. 2007) (excluding expert testimony where statistical analysis did not take into account "obvious confounding factors").

In Appendix II, Yerkes compares character names in *Omaha* and *TWTC* and claims that "characters that have the same or similar names."  Docket No. 93 at 30. He employs this analysis even though the law is clear—character names are not protectable.  *See Silberstein v. Fox Entm't Grp., Inc.*, 424 F. Supp. 2d 616, 630 (S.D.N.Y. 2004) (cartoon character name of "Sqrat" not copyrightable).  And even if they were protectable, his claimed similarities are unsupportable.  Among the purported "names" he compares are not names at all, but rather, generic identifiers:

| BOY(S) | *Omaha* has "That little white boy" (page 3), "my **boy** at State" (page 7), and "the **BOYS**" (pages 39, 54, and 66); *Trouble* has "'computer **boy**'" (page 16), "Danny-**boy**" (page 17), "TEENAGE **BOYS**" (page 33), "OLDER **BOY**" (pages 34 and 36), "Peanut-**Boy**" (pages 36 and 104), "Bacon **Boy**" (page 38, three times), and "Yankee-**boy**(s)" (page 72, twice). |
| --- | --- |
| REPORTERS | *Omaha* has "**REPORTER(S)**" (pages 35, 56, 91, 98 (twice), and 101); *Trouble* has "**Reporters**" (page 104). |

*Id.* at 30, 32, 33.  He also says that "*Omaha* has the '**ALABAMA**' baseball team (page 64); *Trouble* has a baseball game played in '**Alabama**'" (page 63)," Docket No. 93 at 30, ignoring that in *TWTC*, Alabama is the location of a game, and in *Omaha* it is a University.  Other names he equates are dissimilar on their face, like "Connie" (Coach Dodge's deceased wife in *Omaha*) and "Joanna" (Gus' deceased wife in *TWTC*).  Docket No. 93 at 31.

After drawing these false comparison, Yerkes then ignores the dissimilarities that undercut his analysis.  The main characters in *TWTC* are Gus Lobel (the main character, a scout for the Braves), and Mickey Lobel (Gus' daughter, a lawyer), Johnny Flanagan (a former baseball player and current scout for the Red Sox, and

1   Mickey's love interest), Bo Gentry (a high school baseball star), Rigo Sanchez

2   (peanut seller at high school baseball games, and undiscovered pitching phenom),

3   Pete Klein (Director of Scouting for the Braves), Vince Freeman (General Manager

4   of the Braves), and Phillip Snyder (Associate Director of Scouting for the Braves).

5   In contrast, the main characters in *Omaha* are Coach Dodge (main character, Coach

6   of Omaha University), Sandy Dodge (Coach's daughter, a struggling divorced

7   mother-of-two who works as a telemarketer and bartender), Rod Taylor (African-

8   American player on the Omaha team), Steven Brady ("[r]ich, cocky, white" player

9   on Omaha team), and Jimmy Kincaid (Assistant Coach and Sandy's love interest).

10          In Appendix III, Yerkes does the same character-name comparison for

11   *TWTC* and *Touchback*.  Docket No. 93 at 34.  Again, Yerkes makes nonsensical

12   comparisons, for example, comparing the fact that *Touchback* has two characters

13   identified as "'**waitresses**,' one of whom is the main character's future wife," and

14   "*Trouble* has two characters each of whom is identified as '**WAITRESS**' . . . and

15   one of whom 'gives Johnny a wink.'"  *Id.* at 36.  The term "waitress" is as generic a

16   description as they come.  It is not a character name, nor can the common use of

17   such a stock character possibly give rise to an infringement claim.  *E.g.*, *Rice*, 330

18   F.3d at 1175.  Moreover, the waitresses have different very roles.  In *Touchback*,

19   she becomes the main character's wife; in *TWTC*, they have minor, fleeting roles.

20   Yerkes says nothing about these and other "obvious confounding factors,"[3] all of

21   which undercut his opinions.  *Cf. Malletier*, 525 F. Supp. 2d at 643.

22          Finally, in Appendices IV-VI, Yerkes claims to compare words used in

23   *Touchback* and *TWTC*.  In Appendix IV, he again makes nonsensical comparisons,

---

24          [3] *E.g.*, very much unlike *TWTC*, the characters in *Touchback* include: Scott
25   Murphy (the main character, and former high school football star), Thelma Murphy
     (Scott's mother), Gig Young (Scott's high school teammate), Winton (same),
26   Pierson (same), Macy Murphy (Scott's wife), Krista Murphy (Scott's 6-year-old
     daughter), Jamie Murphy (Scott's 4-year-old daughter), Sasha Kent (Scott and
27   Macy's friend); Todd White (Scott and Macy's friend), Coach Hand (high school
     football coach), Chris Hall (Scott's best friend and teammate), Jenny Dugan
28   (Scott's high school love interest), and Carl Dugan (Jenny's father).  Docket No. 93
     at 286-87, 289-90, 292-93 293, 295, 296, 304, 329.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1 like a football team name in *Touchback* ("Versailles Saints") and baseball team in

2 *TWTC* ("Morgantown Devils"), Docket No. 93 at 37, and generic phrases like "to

3 worry," *id.* at 38, or "nice to see you," *id.* at 42.  In Appendices V and VI, Yerkes

4 notes the number of sentences in *Touchback* and *TWTC*, respectively, that begin

5 with a participle and with a first-person finite verb, without explaining the

6 relevance of these random observations, tethering them to any recognized learned

7 method, or taking into account the normal use of such speech.  *Id.* at 46-50.

8 *Daubert*, Rule 702, and the copyright cases require far more than such results-

9 driven *ipse dixit*.  Yerkes' testimony should be stricken in its entirety also.

10 **IV.   PLAINTIFFS' "BASEBALL" EXPERTS SHOULD BE EXCLUDED**

11        Plaintiffs rely on two baseball "experts" to assert that many late-1990s *TWTC*

12 scripts are fakes because they show a scout using a computer to calculate "advanced

13 baseball metrics"—metrics that the experts assert did not exist until 2003.  Docket

14 Nos. 66 at 21-22; 66-4; 66-5.  These experts should be excluded for three reasons.

15        First, they ignore that movies are *fiction* and need not comply with the laws

16 or baseball (or physics).  As a well-known example, space is a vacuum, and sound

17 cannot be heard there.  Yet, *Star Wars*—one of the most popular movies ever—

18 features *audible* laser blasts in outer space.  STAR WARS: EPISODE IV - A NEW HOPE

19 (Lucasfilm 1977).  Baseball movies fictionalize events in the same way.  *The*

20 *Natural* features an unrealistic (dramatic) scene where a homerun knocks out the

21 lights in a stadium.  THE NATURAL (TriStar Pictures 1984).

22        Second, Plaintiffs' experts attack a straw man—*not* what Brown's 1990s

23 scripts actually say—and the opinions do not or "fit" this case.  Brown's scripts did

24 not discuss yet-to-be-invented metrics.  Rather, in one short scene, a scout with a

25 computer accesses a player's batting average and says my "computer tells he's

26 ready to move to [the] Double A" team, Docket No. 103-1 at 81:

27

28

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

```
                    VINCE FREEMAN, 45, heads a meeting.  Vince is the General
                    Manager of the Braves.  On one side of him sits PETE KLEIN,
                    50, Director of Scouting.  Pete is sturdy, no-frills.

                    On the other side sits PHILLIP SNYDER, Associate Director of
                    Scouting.  He's a razor-sharp, Armani clad, 35.  In their own
                    ways, Pete and Phillip represent baseball's past and present.

                    Phillip's fingers fly across a laptop, inputting and receiving
                    information.
                                        PHILLIP
                           Tremendous, oh-so-fucking tremendous.
                           Jones, playing up in Waterloo, went
                           three-for-four again.

                                        PETE
                           Wasn't he just arrested on assault
                           charges?

                                        PHILLIP
                           What's a couple of assaults when
                           you're hitting .350?  Based on his
                           current average, the computer tells me
                           he's ready to move to Double A.

                                        PETE
                           You and that computer.

                                        PHILLIP
                           Current, Pete.  Gotta be current.
                           These new programs are a vital tool in
                           evaluating today's talent.
```

Any "expert" suggestion that Brown's script relied on yet-unknown "sabermetrics," Docket Nos. 66-4 ¶¶ 7-10; 66-5 ¶ 3, is unreliable and flatly false. "Batting average," the *only* statistic mentioned above, is among the oldest in baseball.  A news story about Plaintiffs' expert—from *1980*—highlights batting average as a key metric, as do news stories from *100 years ago*.  *See* Pearson Decl. Ex. I (1980 news article reporting that Tal Smith fired and replaced by Al Rosen "who led the American League in hitting with a .336 average"); *id.* Ex. F (1903 article: Honus Wagner "led the National League batters" with a ".352" average).[4]

The use of computers in baseball scouting is not only a creature of the 2000s. *Cf.* Docket Nos. 66-4 ¶¶ 7-10, 12; 66-5 ¶ 3, 6.  Using computers to scout players dates back to the *1980s*.  For example, a 1983 article reports that "[s]abermetrics, or

---

[4] The Court can take judicial notice of such articles "to indicate what was in the public realm at the time," *Von Saher v. Norton Simon Museum of Art*, 578 F.3d 1016, 1022 (9th Cir. 2010), and defendants separately move the Court to do so.

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

the mathematic massaging of baseball statistics . . . have been able to simulate actual game conditions and estimate [] probable results."  Pearson Ex. K at 205. The story notes that the Chicago White Sox, Oakland A's, and Texas Rangers all experiment with them.  *Id.*  A 1983 *Newsweek* article states:  "The A's inadvertently ushered in the computer era when they bought a system called Edge 1,000 … two years ago," in 1981.  *Id.* Ex. J at 203.  While the program was originally used to determine "mundane things like batting averages," it had been adapted by 1983 to produce more "detailed player evaluations."  *Id.*  A 1997 article reports that a software program called "Lead Dog Stats" "allows you to download daily feeds of 100,000 'statistical events' from Major League Baseball and create your own custom statistics."  *Id.* Ex. Q at 230.

The notion of one of Gus's rivals on the Braves—*a professional team*—using a computer program to analyze minor league statistics was hardly unfounded in 1996.[5]  And, again, even if it were, Brown wrote *TWTC* as a work of *fiction*.[6]

Asserted "expert" testimony like this—which bears no relation to the facts of this case or to reality—is inadmissible.  *E.g.*, *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829-31 (9th Cir. 2001); *Chiate v. Morris*, 1992 WL 197591, at *4-5 (9th Cir. Aug. 17, 1992) (excluding expert testimony where expert failed to

---

[5] *See also, e.g.*, *id.* Ex. P (M. Sebastian, *Project Predicts Baseball Victories*, DENVER POST, Sept. 7, 1996, at B-02) (reporting that graduate students pitched computer program to Colorado Rockies that "can spit out predictions of how each player will perform based on computer analysis"); *id.* Ex. N (E. Cohen & P. Palmer, *Staturation; Media of the '90s are Bombarding Baseball Fans With Numbers That Strike Out*, THE SPORTING NEWS, May 6, 1991, at 15) ("What the instant replay was to the 1980s, statistics are to the 1990s").

[6] Plaintiffs and their experts also criticize Brown for including in *TWTC* a baseball scouting "combine," high school players signing autographs for money, and a marching band playing at a baseball game—which they assert are unrealistic. Docket No.66-4 ¶ 11; Docket No. 66-5 ¶ 8.  Again, *TWTC* is *fiction*.  Moreover, as public records show, these are all non-aberrational concepts.  *See* SGI 71 (video of marching band playing at *baseball* game); Pearson Decl. Ex. U (college policy, dating back to 1990s, barring student-athletes from signing autographs); *id.* Ex. T (sports agency debating merits of baseball "combine" akin to pro football combine).

WARNER DEFS.' MOT. TO
STRIKE EXPERT OPINIONS

1   apply an objective analysis "*to the songs at issue*"); *Ruth v. A.O. Smith Corp.*, 2006

2   WL 530388, *12 (E.D. Ohio Feb. 27, 2006) (expert testimony was excludable

3   under FED. R. EVID. 403, as it attacked a "straw man").

4   **V.   PLAINTIFFS' "FORENSIC" EXPERT SHOULD BE EXCLUDED**

5          Finally, Plaintiffs employed a computer forensics "expert," Trevor Reschke,

6   to image the seven computer floppy disks that Brown and Cooper submitted—and

7   that contain 10 electronic copies of *TWTC* scripts from the 1990s to early 2000s.

8   Reschke used a computer program called "EnCase" to evaluate whether the scripts

9   were actually authored and saved in the 1990s and early 2000s, as Brown and

10  Cooper attested.  Docket No. 71 ¶ 7.  After an expensive examination procedure,

11  Reschke challenged one—*and only one*—*TWTC* script on any substantive ground.

12         That challenge, however, was plainly unreliable and should be excluded.

13  Reschke asserts that one of *TWTC* files on one of the disks had "a *last written* date-

14  time stamp that precedes [sic] its *creation date* time stamp."  Docket No. 71 ¶ 8

15  (emphasis added).  He contends this observation "is significant because there is *no*

16  *normal process*" that would create this result.  *Id.*  But the *EnCase* <u>reference guide</u>

17  explains this was a very "normal process" if Brown merely moved the file from his

18  computer directly to the disk to save it without ever editing the file on his disk:

19  **File Created**              This column indicates the date/time a file was created in that partic-
20                               ular location. You can edit a file after it was originally written, giving
                                 it a last written date/time later than originally written (created). If you
21                               move it to a new location, the file will take on a new creation date/
                                 time for when and where it was moved, making it "appear" to have
22                               been created after it was last written. This concept confuses many,
                                 but the key is understanding that the creation date/time typically
23                               indicates when it was created *in its current location* and that files can
                                 be moved around after they were last written.

24  Pearson Decl. Ex. Z at 271 (EnCase Guide).  Brown explained in his declaration

25  that he used the disks to save copies of his scripts, Docket No. 99 ¶ 7, and so this

26  "normal process" is fully explained, even if Reschke is "confuse[d]."

27

28

WARNER DEFS.' MOT. TO
                                                                                        STRIKE EXPERT OPINIONS

Equally unhelpful are Reschke's non-forensic observations that require no specialized knowledge.  For example, he claims "the labels [on the disks] . . . were placed on the disks aligning the label to the top of the disks."  Docket No. 71 ¶ 6.  He says this is "significant," but never explains why.  Similarly, he observes that different pens were used on one label (when he has no professed expertise in ink-dating),[7] but again, fails to explain the significance of this observation.  *Id.*

Moreover, Reschke *does not dispute* the 1990s and early 2000s creation dates of *nine of the ten scripts.*  Instead, he notes that it is possible to fabricate computer evidence, but neither explains nor shows how any fabrication occurred.  Docket No. 71 ¶ 6.  Such "could have happened" opinions are irrelevant and cannot be used to contradict percipient testimony from Brown and many others about when he created *TWTC*.  *E.g.*, *Cottrill*, 87 Fed. Appx. at 806 (expert opinion that it was "technically possible" to alter electronic evidence was "speculation" that could not preclude summary judgment in infringement case); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *Selle*, 567 F. Supp. at 1182.

## IV.   CONCLUSION

For the foregoing reasons, the Warner Defendants' motion to strike should be granted, and Plaintiffs' expert testimony should be excluded.  Whether the Court considers this testimony or not, final judgment can and should be granted in the Warner Defendants' favor on grounds of both prior creation of *TWTC*, and lack of similarity between *TWTC* and *Omaha*, as a matter of law.  *See* Docket Nos. 98; 109.

---

[7] Any professional opinion proffered by Reschke on the subject of ink-dating should be excluded under Rule 702.  "[D]esignation as an 'expert' is not a license to unconstrained testimony on all scientific, technical, and other specialized matters."  3 *Federal Rules of Evidence Manual*, § 702-02[3] (Matthew Bender 10th ed.); *see Malletier,* 525 F. Supp. 2d at 642 ("An expert qualified in one subject matter does not thereby become an expert for all purposes.  Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.")

1

2     Dated:  January 8, 2014                    Respectfully submitted,

3                                                O'MELVENY & MYERS LLP

4                                                By:   /s/ Ashley Pearson
                                                        Ashley Pearson
5                                                Counsel for Warner Defendants
      OMM_US:72015311
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WARNER DEFS.' MOT. TO
                                                 STRIKE EXPERT OPINIONS