1   LAW OFFICES OF GERARD FOX, INC.
    GERARD P. FOX (SBN 151649)
2   gfox@gpfoxlaw.com
    JUNE L. QUAN (SBN 286779)
3   jquan@gpfoxlaw.com
    JEFFREY Z. LIU (SBN 276849)
4   jliu@gpfoxlaw.com
    ERIKA E. MORRIS (SBN 279318)
5   emorris@gpfoxlaw.com
    1880 Century Park East, Suite 600
6   Los Angeles, CA 90067
    Telephone:  (310) 441-0500
7   Facsimile:  (310) 441-4447

8   Attorneys for Plaintiffs Gold Glove
    Productions, LLC and Ryan A. Brooks
9
                    **UNITED STATES DISTRICT COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11

12  GOLD GLOVE PRODUCTIONS,          Case No.  CV13-07247-DSF (RZx)
    LLC, a California Limited Liability
13  Company and RYAN A. BROOKS, an   **PLAINTIFFS' OPPOSITION TO**
    individual,                      **WARNER DEFENDANTS'**
14                                   **MOTION FOR SUMMARY**
                    Plaintiffs,      **JUDGMENT**
15
            v.
16                                   FILED HEREWITH: STATEMENT
    DON HANDFIELD, an individual,    OF GENUINE DISPUTES OF
17  TRESSA DIFIGLIA HANDFIELD, an    MATERIAL FACT; OBJECTIONS TO
    individual, RANDY BROWN, an      AND MOTION TO STRIKE,
18  individual, MICHELE WEISLER, an  DEFENDANTS' SUPPORTING
    individual, CHARLES FERRARO, an  DECLARATIONS; PLAINTIFFS'
19  individual, JAY COHEN, an individual,  MOTION FOR RULE 56(D)
    ROBERT LORENZ, an individual,    CONTINUANCE; DECLARATION
20  UNITED TALENT AGENCY, INC., a    OF JEFFREY LIU; DECLARATION
    California corporation, THE GERSH  OF DAVID YERKES;
21  AGENCY, a California corporation,  DECLARATION OF RYAN
    WARNER BROS. PICTURES INC., a    BROOKS; DECLARATION OF
22  Delaware corporation, MALPASO    SHERIL ANTONIO; DECLARATION
    PRODUCTIONS, LTD., a California   OF FRANK HICKS; DECLARATION
23  corporation, WARNER BROS.        OF LARRY STEWART;
    DISTRIBUTING INC., a Delaware    SUPPLEMENTAL DECLARATION
24  corporation, WARNER BROS. HOME   OF LARRY STEWART;
    ENTERTAINMENT INC., a Delaware   DECLARATION OF TREVOR
25  corporation, WARNER BROS.        RESCHKE; [PROPOSED] ORDER
    DOMESTIC TELEVISION              DENYING WARNER DEFENDANTS'
26  DISTRIBUTION INC., a Delaware    MOTION FOR SUMMARY
    corporation, TW UK HOLDINGS INC.,
27  a Delaware corporation, and DOES 1-
    10, inclusive
28

| | |
|---|---|
| 1 | Defendants. |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

JUDGMENT; [PROPOSED] ORDER
GRANTING RULE 56(D)
CONTINUANCE


The Hon. Dale S. Fischer

DATE:                February 24, 2014
TIME:                1:30 p.m.
COURTROOM:    840

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Pages(s)

I.   SUMMARY OF ARGUMENT................................................................ 1

II.  STATEMENT OF GENUINE ISSUES OF MATERIAL FACT......... 7

    A.  THE PLAINTIFFS AND THEIR COPYRIGHTED, ORIGINAL WORK.................................................................... 7

    B.  DON HANDFIELD WROTE *OMAHA* AND THE SCRIPT OF *TROUBLE WITH THE CURVE* THAT BECAME THE MOVIE................................................................ 10

    C.  DEFENDANTS HAVE FABRICATED THE PRIOR CREATION DEFENSE ................................................................ 12

        1.  Forensic Analysis of Floppy Disks ...................................... 12

        2.  Forensic Analysis of the Spiral Notebooks with Alleged 1997-98 Handwritten Notes and the Circa 1998 Innovative Arts script.................................................. 15

        3.  Forensic Analysis of Handwriting on the Floppy Disc Labels ............................................................................. 16

        4.  Brown's Inconsistent Prior Public Statements...................... 17

        5.  The "Smoking Gun" *Moneyball* Scene................................. 17

        6.  Brown Does Not Recall Motivation for Characters, When Scenes Were Written, Which Fabricated is Which .................................................................................. 19

        7.  Brown did Not Know the Subject Matters of the Screenplay and Admitted to doing Absolutely No Research ............................................................................... 20

    D.  Brown Admitted Others Advised Script Changes in 2011 to Turn The Light Comedy into a Tugging Drama ......... 21

    E.  Brown Registered Other Works, but not This Script .............. 21

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

F.     The Defense Declarations Are Tied to Fabricated Evidence and Reliant Thereon....................................................22

III.    LEGAL ARGUMENT ...........................................................23

A.  THE FACTS ARE TO BE VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFFS ....................................23

B.  DEFENDANTS FAILED TO CARRY THEIR BURDEN TO PROVE PLAINTIFFS COPIED THEIR ALLEGED PRIOR CREATION/WORK........................................................23

C.  DEFENDANTS' CITED CASES ARE DISTINGUISHABLE ...............................................................24

D.  THERE EXIST MANY CONTROVERTED FACTS.................25

IV.    CONCLUSION .....................................................................25

TABLE OF AUTHORITIES

<u>CASES</u>                                                                Page(s)

*Armour v. Knowles*
    512 F.3d at 154...............................................................................25

*Bauer v. Yellen,*
    548 F. Supp. 2d 88 (S.D.N.Y. 2008) ...............................................24

*Bernal v. Paradigm Talent and Literary Agency*
    1997 U.S. Dist. LEXIS 10613 (C.D. Cal. May 20, 1997).............................24

*Cleary v. News Corp.*,
    30 F.3d 1255 (9th Cir. 1994)...........................................................6

*Cottrill  v. Spears*,
    87 F. App'x 803 (3d Cir. 2004) .......................................................24

*Fogerty v. MGM Grp. Holdings Corp.*
    379 F.3d 348 (6th Cir.2004).............................................................24

*Leeds Music Limited v. Robin*
    358 F.Supp. 650 (S.D.O. 1973)....................................................6, 24

*Masquerade Novelty v. Unique Industries*
    912 F.2d 663 (3d Cir. 1990).......................................................23, 24

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U. S. 574. (1986)....................................................................23

*N. Coast Indus. v. Jason Maxwell, Inc.*,
    972 F.2d 1031. (9th Cir. 1992)..............................................6, 23, 24

*Smith v. Jackson,*
    84 F.3d 1213. (9th Cir. 1996)......................................................6,23

*Weygand v. CBS,*
    1997 U.S. Dist. LEXIS 10613 (C.D. Cal. May 20, 1997).............................24

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

<u>STATUTES</u>                                                                                                 Page(s)

17 U.S.C. § 410.............................................................................................6,23

17 U.S.C. § 501...............................................................................................23


<u>OTHER AUTHORITIES</u>

F.R.Civ.P. 56 ..................................................................................................6,7

# I.  Summary of Argument

Plaintiffs submit that the Motion for Summary Judgment filed by Defendants Warner Brothers Studio Enterprises Inc., et al. is not supported by uncontroverted admissible evidence, is premature, and does not carry Defendants' burden with respect to proving a prior creation defense as a matter of law.  This Opposition offers clear and convincing proof that Defendants' testimony and other alleged evidence rests upon fraudulent documents and things.

Former United States Army Counterintelligence Special Agent and digital investigator, Trevor Reschke, fully and properly examined the source of the scripts referenced in all the Moving Parties' Declarations.  He examined 13 floppy disks, on which Defendant Brown claims to have stored the scripts evidencing his prior creation.  Mr. Reschke found clear evidence that the date/time stamps of the disks were manipulated to present inaccurate information about date of creation.  He also found that (i) there were codes within the data examined that relate to an operating system not on the market during the alleged dates of creation for these scripts, and (ii) that the 3M Imation 3.5 inch disks had not been put on the market during the time Mr. Brown says he created and saved scripts to this specific brand of floppy disks.  Mr. Reschke opines that there is evidence of computer processes that could only happen with today's modern computers.  Finally, Mr. Reschke found forensic evidence that a "cleaning" or "wiping" program was used to alter content that pre-existed on certain of the disks.  Mr. Brown admitted under oath he did not know what a "cleaning" or "wiping" system was and had never used one.  He did say that defense counsel sent a "computer professional" to the door of his house and that they took his "floppy discs" and have not returned them.  Mr. Reschke concludes in his detailed forensic report as follows: "The forensic examination conducted on the floppy disks detailed in this report leads me to believe that they have been manipulated to provide the appearance of disks used from 1990 to 2003; they contain system information not consistent with the dates of use suggested by the

date time stamps present, manipulated date time stamps, signs of file wiping, and indications of activity that is not plausible.  There are various anomalies and indicators that these disks were manipulated to look as if they were truly being used at the time periods alleged, when based upon our examination that is not plausible or possible for the reasons stated in this report."  See Decl. of Trevor Reschke ("Reschke") Decl. ¶5, Ex. 2

Defendants' evidence is also claimed to be supported by an alleged original printout of a 1998 Innovative Arts *Trouble with the Curve* script Mr. Brown said he "found" stored in his home, and several documents that Mr. Brown testified under oath are full of his original ballpoint pen written notes regarding the infringing script that he allegedly wrote in 1997-98.  (This "evidence" was not provided until 69 days after Defendants were served with the Complaint). As a result, Plaintiffs asked Former Questioned Document Examiner and National Expert on Matters Concerning Ink for the United States Secret Service, Larry Stewart, to conduct a complete and proper forensic examination of these supposedly original documents.

Mr. Stewart employed reliable ink dating techniques and concluded that inks in these documents were not written in or about 1998, but instead in the last two years.  Mr. Stewart further found that two spiral notebooks examined, each of which had bar codes and information about the manufacturer, had not yet been made commercially available for purchase during the period they were alleged to have been owned and used by Mr. Brown.  Mr. Stewart found that the toner used to print out the claimed original script that has been allegedly kept since circa 1998 is associated with an office machine system that did not exist until years later. Finally, Mr. Stewart found the materials he examined had been compromised. There were 60 pages professionally torn out of the documents examined.     Mr. Stewart concluded as follows:  "These results in combination yield a highly probable conclusion that the Exhibit Q1 through Q4 document collection was not produced in 1997-98, but instead much more recently."  See. Decl. of Larry Stewart

("Stewart Decl.") ¶26.[1]

These forensic reports provide clear and convincing proof that Defendants have offered evidence that has been manipulated and fabricated. All three forensic experts are willing to appear in Court for an evidentiary hearing on the issue of whether testimony has been offered to this Court based upon manipulated and fabricated documents and things.  This evidence alone controverts the claim of an authentic prior creation by Mr. Brown.

There is substantial other clear and convincing evidence that proves the evidence offered by Defendants is fabricated and not true.  Mr. Brown gave two documented public interviews in October 2012 regarding *Trouble with the Curve* (well before this litigation).  He stated clearly in both that he allegedly wrote the first draft of this screenplay in or about 2002 (while now testifying he allegedly wrote it six to ten years earlier).  Mr. Brown testified in his deposition that he was truthful when he gave that interview.  Now he claims he first conceived of and wrote his drafts starting in 1996.

In fact, Mr. Brown testified in his deposition that he originally wrote something quite different under the name *Trouble with the Curve* that was mostly a "cartoonish," "comedic," romantic comedy about a male and female scout who scouted the same player and fell in love.  Mr. Brown admits what he wrote was such a light comedy he did no research on scouts and did not know much about scouting. Mr. Brown has not produced that script for review.

Also, the fabricated scripts are implausible when viewed along a historical timeline of when certain things could be known to have occurred. Nearly all the fabricated scripts (those printed out from the fabricated floppy disks, and the non-authentic Innovative Arts printout) include a scene that Mr. Brown said he wrote in

---

[1] Mr. Brown also testified that he was the only one to write the folder names on the labels on the floppy discs and to use them.  Certified Forensic Document Examiner and Handwriting analysis expert, Frank Hicks, who founded and ran the Questioned Documents Section of the Mississippi Crime Laboratories for twenty four (24) years, has opined that a proper handwriting analysis of the labels indicate that there are at least two, if not more, writers who wrote on

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1996-98: they each involve a Major League Baseball Scouting Director akin to Paul DePodesta using a wireless laptop to tap into real time minor league at bats, and reading out advanced baseball metrics.  Mr. Brown testified he had no ties to Major League Baseball or scouting, and admitted to knowing nothing about scouting departments in the MLB at all.  This "smoking gun" scene depicts a phenomenon called *Moneyball*, which was unveiled in the book by that name written by noted author Michael Lewis in 2003.  Mr. Lewis' book, once published, made known to persons outside of the Oakland Athletics organization a practice the A's General Manager Billy Beane was secretly honing and carrying out with Paul DePodesta in early 2000-2003: it involved laptops, Ivy League "suit" types, software with real time tie-ins to games underway and advanced baseball metrics.  Not until the years thereafter (2004-2007) did this catch on with other MLB teams.  Mr. Brown admits to having read the book entitled *Moneyball* and having seen the movie *Moneyball* released on September 23, 2011.  It was impossible for him to have foreseen, much less written those *Moneyball*-like scenes in 1996-1998, yet he claims he did. Baseball General Managers and experts on the history of the MLB, Gerry Hunsicker of the Dodgers, and Tal Smith have provided their expert declarations to the Court to share that not even those who were the MLB's top executives knew of the future use of laptops, high tech sabermetrics, and real time software in Scouting Departments (especially for scouting amateur players) until 2004 or 2005.

This "*Moneyball* scene" was so obvious that Mr. Brown was asked about this point blank in one of his two interviews.  The interviewer expressed that this scene seemed to be playing off *Moneyball*, the book and later movie.  In those interviews, Mr. Brown firmly stated he started writing his version of *Trouble with the Curve* precisely one year before the book *Moneyball* came out, in 2002.  To do so, he would have had to be clairvoyant.  Now he claims to have foreseen this even earlier; i.e., in 1996, although knowing nothing about MLB scouting either then or

the labels of the floppy discs.  This is directly at odds with what Mr. Brown stated under oath.

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  now.

2    Some of the facts found in these fabricated 1996-2000 scripts relate directly

3  to Plaintiff Ryan Brooks' own notable high school and college baseball career.  Mr.

4  Brown cannot explain how this happened.  Mr. Brown cannot give the inspiration

5  for most of the writing that is found in the production version of *Trouble with the*

6  *Curve*.  Mr. Brown spoke most about some scenes he himself called "comedic" and

7  "cartoonish."   Those "cartoonish" and "comedic scenes" – few in number – seem

8  to date back to what he may have really written in the 90s which appears to have

9  been a very different screenplay or television script than what the infringing

10  *Trouble with the Curve* became.  Mr. Brown admits that much of the August 2011

11  production script contains material added at the behest of others in the summer of

12  2011, long after Plaintiff Gold Glove Productions' copyrighted works were

13  completed. *See* Declaration of Jeffrey Liu ("Liu Decl."), Ex. F at p. 245, ln. 23-45;

14  p. 252, ln. 1-2, 5-7; p. 253, ln. 1-8; p. 258, ln. 16-20, 22-25; p.259, ln. 1-3, 10-16; p.

15  260, ln. 22-24; p. 262, ln. 22-24.

16    Mr. Brown admitted he himself registered with the Writer's Guild the few

17  actual TV show scripts he wrote as spec scripts.  He admitted he most always had

18  adequate and in some cases, very well-known agents, transactional attorneys, and

19  personal managers, and that he took writing extension courses in which he was

20  likely taught about the need to copyright one's work.  Yet, he admits he has no

21  Writers' Guild Registration or Copyright Registration to offer with respect to these

22  alleged prior created drafts of *Trouble with the Curve*, even though he claims to

23  have optioned the script to a production company and passed it all over town.  This

24  is not plausible either.

25    Additionally, one of the most established authorship experts, Professor David

26  Yerkes of Columbia University, read all of Defendant Don Handfield's scripts and

27  those scripts of Mr. Brown that can be authenticated.  Mr. Yerkes provides an in

28  depth authorship analysis with respect to the August 2011 production script (which

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  very closely aligns with the infringing motion picture). He opines that the true

2  author of the August 2011 script is Don Handfield, unequivocally, and that it's

3  nearly impossible to conclude otherwise.  Professor Antonio, the Associate Dean of

4  New York University's Tisch School of the Arts, shares this opinion having arrived

5  at this conclusion through her own authorship analysis, independent of Professor

6  Yerkes.  They both also opine, having read Mr. Brown's few authentic works, that

7  he absolutely is not the author of the script that lead to the film entitled *Trouble*

8  *with the Curve*.  There is hence no issue of access.  This is because the actual author

9  of *Trouble with the Curve*, Mr. Handfield, irrefutably wrote the copyrighted work

10  *Omaha* as a work for hire for Plaintiff Gold Glove Productions – and then acting

11  with others, harvested therefrom the unique father-daughter drama and transplanted

12  it within the film that became *Trouble with the Curve.*  Mr. Handfield has yet to be

13  deposed and has offered no declaration to this Court.

14      Moreover, Plaintiffs copyrighted all of their works, and some of them well

15  before when it was that those involved in the production of *Trouble with the Curve*

16  finally copyrighted the infringing work (in production of the film).  Under 17

17  U.S.C. Section 410(c), Plaintiff's registration certificates constitute prima facie

18  evidence of the validity of its copyrights.  Because originality is necessary for

19  validity, the certificate is prima facie evidence of originality.  Therefore, to sustain

20  their burden of overcoming this statutory presumption of originality of Plaintiff's

21  work, and to be able to prove prior creation, the Moving Parties must show that

22  Plaintiffs copied the "idea" of the "prior source and its expression."  See e.g. *N.*

23  *Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992); *Leeds*

24  *Music Limited v. Robin*, 358 F.Supp. 650, 659–60 (S.D.O. 1973).  The Defendants'

25  moving papers don't even address this point or burden.

26      Finally, under Rule 56(d), Plaintiffs are entitled to discovery before a

27  dispositive ruling on this record.  Defense counsel has to date limited Plaintiffs to

28  only those depositions of its choice and has allowed only two.  Plaintiffs have filed

1   concurrently herewith a Rule 56(d) motion with a supporting declaration.

2   ## II. Statement of Genuine Issues of Material Facts

3   ### A. <u>The Plaintiffs and Their Copyrighted, Original Works</u>

4   Ryan Brooks is the founder of Plaintiff Gold Glove Productions.  He was a

5   high school and college baseball standout.  He played third base (as does the Bo

6   character of *Trouble with the Curve)* his entire career, which was shortened by an

7   injury (like the Johnny character in *Trouble with the Curve*). He was scouted

8   heavily throughout (like the Bo character in *Trouble with the Curve*), went to the

9   college World Series which was played at Rosenblatt's Stadium (referenced

10  specifically by name in *Trouble with the Curve)* and ate their famous pastrami

11  sandwiches (also referenced in *Trouble with the Curve*).  Docket No. 76 at 2, 10,

12  also see Docket No. 93 at 180, 224, 242. His college coach at the University of

13  Texas at Austin was Augie Garrido, who is known to be an older, grumpy,

14  irascible, cursing baseball icon.  Coach Garrido and his mannerisms and personality

15  left an indelible mark on Plaintiff Ryan Brooks over the years. See Decl. of Ryan

16  Brooks ("Brooks Decl.") ¶9, Ex. H and Liu Decl. Ex. E.  Mr. Brooks lost his Mom

17  to cancer after college.  While with his mother in her last months, she shared with

18  him that as an only child and daughter to her estranged father, she had always felt

19  pushed away and frustrated.  This was an emotional time and remembered to this

20  day by Plaintiff Mr. Brooks.[2] Docket No. 76 at 2-3.

21  In late 2004, Mr. Brooks was kicking around the idea of a baseball story

22  about a player dying of cancer, and he was looking for a solid writer to draft a

23  baseball screenplay as a work for hire for his production company in collaboration.

24  He chose the prolific writer, Don Handfield.  Mr. Handfield was steeped in

25  knowledge about Ohio State football, but not baseball, so the two undertook weeks

26  of intense research.  They went to college baseball games, met college coaches,

27

28  [2] Mr. Brooks' production company, Gold Glove Productions, won an Academy Award last year in connection with the film, *Inocente*. *See* Docket 76 at 1-2.

7

1   many scouts, announcers and players.  They spent weeks at the College World

2   Series at Rosenblatt's Stadium, in fact eating hot pastrami sandwiches, as ideas Mr.

3   Handfield had, Ryan's mother's story about being an estranged daughter and the

4   snapshots of the older, irascible coaches, like Augie Garrido, all came together.

5   Piece by piece these formed into a unique, compelling and dramatic father/daughter

6   baseball story: one about an elderly baseball lifer and long-time widow facing the

7   last year under his contract and an illness he was ignoring and hiding – all while he

8   tries to reconcile with his only child and 31 year old daughter with whom he has a

9   dysfunctional relationship. *Id* at 7 and Brooks Decl. Exs. F, I.

10          By July, 2005, Mr. Handfield and Mr. Brooks had a complete draft of

11   *Omaha*, with the full main frame of this unique father/daughter baseball story.  This

12   included the father driving an older car, swiping it against the garage, his smoke

13   alarms going off in the kitchen, and drinking scotch when sad.  It also included his

14   daughter leaving behind her job to come move into his life and her discovery of his

15   hidden illness.  In their script, this was followed by a choppy at first, but then

16   lovely reunion, where the daughter asks her father to break down and play some

17   baseball just with her, all this, during which she falls in love with a younger version

18   of her father.  The Handfield/Brooks team worked toward a second complete draft,

19   where the goal from that point on was to develop the daughter character to be more

20   educated, modern and healthy in contrast to her father, and to develop also her love

21   interest.  Docket No. 76 at 7 and Brooks Decl. Ex. I.

22          On May 15, 2006, Mr. Brooks registered the May 10, 2006 draft of *Omaha*,

23   his unique, and original father-daughter baseball story.  See Brooks Decl. Ex. A (a

24   true and correct copy of the official USCO copyright report from May 10, 2006 for

25   *Omaha*).   These rights were later assigned to his production company, Plaintiff,

26   Gold Glove Productions, and that assignment was recorded with the United States

27   Copyright Office. See Brooks Decl. ¶3, Ex. B and Docket No. 76 at 7.  The two

28   gentlemen went their separate ways in late 2006 due to other business

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

commitments.  Mr. Brooks, however, brought Mr. Handfield back in the summer of 2008, under another work for hire agreement that incorporated the first, to nail down a final draft that could be used to head into production.  Mr. Brooks gave Mr. Handfield detailed notes regarding the need to make the daughter even more educated and independent, to deepen the story regarding her love interest who was a colleague of her father's in his baseball job, and for there to be a moving scene where the father apologizes for having pushed his daughter away.  Mr. Brooks not only gave these specific notes to Mr. Handfield, he kept them, and has provided them to the Court. Docket No. 76 at 11, 12 and Brooks Decl. Ex. G (a true and correct copy of the notes Brooks gave to Handfield  for an *Omaha* polish in 2007). He also spent a good bit of money producing a trailer of what the movie might look like and included clips of montages that he wanted developed, including having the father smoking a cigar, and the daughter being visibly upset when she discovered her father was sick.  The concept real was registered for copyright protection because of the importance of that work.  Docket No. 76 at 10 and Brooks Decl. ¶9-10, Ex. F.

A dispute broke out between Mr. Brooks and Mr. Handfield because Mr. Handfield greatly delayed the turning in of the final script, and also surprisingly seemed to take this story well off its intended path. They exchanged lawyers' letters copied to, among others, the Defendant Charles Ferraro at the United Talent Agency (who later became the agent to both Handfield and Brown). The parties simply went their separate ways, this time, for good. [3]

Mr. Brooks then discovered, in stages, that Defendants were producing a father/daughter story, which in all respects was nearly identical to his own, but for they had changed the back story of the father's baseball career from college coaching to scouting, seemingly lifting some of that camouflage from *Moneyball*, which had just been released.  Mr. Brooks looked up the credited writer, Mr.

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Brown, on IMDB, and saw he had only one formal writing credit that was over a decade ago.  It was for episodic television and comedy.   He also saw Brown had spent the past many years following a separation from his wife devoting his time to a musical band called the *Neighbors*, who were playing small venues in Los Angeles and Las Vegas.  Finally, Mr. Brooks looked up who was representing Mr. Brown.  Mr. Brooks discovered in time that Mr. Brown had the exact same agent at that time as Mr. Handfield – Mr. Ferraro. Following months upon months of investigation, Plaintiffs initiated this lawsuit.

### B. Don Handfield Wrote *Omaha* and the Script of *Trouble with the Curve* that Became the Movie

First, as noted, there are scenes in *Trouble with the Curve* that are directly tied to Ryan Brooks' own unique baseball life.  He was hit in the head by Josh Beckett in a baseball game. That was known in Texas by fans who followed them both play, and shared many times with Don Handfield.  Mr. Brooks took Mr. Handfield to Rosenblatt's Stadium, where the College World Series was played until it was closed a few years ago.  It's known for many of its sandwiches and its pastrami was one of Ryan's favorites.  Ryan played third base his whole career. As noted, there are direct and very specific references to each of these events from Mr. Brooks' own life in Trouble with the Curve. Docket No. 76 at 2, 5, 6, 10 and Docket No. 93 at 180, 224, 242.

Second, as noted, the entire father/daughter story and structure, especially as more fully developed in later drafts of *Omaha*, in Mr. Brooks' final draft notes and the concept reel, appears nearly identically in *Trouble with the Curve*.  Three well-credentialed experts have opined the two father/daughter stories are strikingly similar. *See* Docket No. 73 at 11, Docket No. 93 at 14, Docket No. 96 at 8-9. Third, and most importantly, two experts have opined that (a) Mr. Handfield unequivocally is the author of the script upon which the movie *Trouble with the*

*Curve* is based, and (b) Mr. Brown is not the author of the script upon with that movie was based. *See* Docket No. 93 at 14; Docket No. 96 at 6-7; Declaration of David Yerkes ("Yerkes Decl.") ¶2, Ex. 1; Declaration of Sheril Antonio ("Antonio Decl.") ¶12-13, Ex. 1.

Professor Yerkes is one of the leading authorship experts in the World. Not that long ago it was his testimony that proved that an opinion issued by the Philippines' Supreme Court was in part authored by one of the parties to the suit. *See* Liu Decl. Ex. G. In his two declarations submitted to this Court, Professor Yerkes explains fully how he uses a process of analysis accepted throughout Europe and the United States to determine authorship. It involves a time consuming, exhausting review of the linguistic details of a person's writings, which are their writing "finger prints." Interestingly, we each write linguistically a bit different. To prove someone is the author of a work, one must study intensely the linguistic details of writings it is agreed that person wrote and then study the linguistic details of the work at issue. If these linguistic details are consistent, you have a match on authorship. *See* Yerkes Decl. ¶5. Professor Yerkes opined that not only do *Omaha*, written by Defendant Handfield, and *Trouble with the Curve* share an "overwhelming number of identical [linguistic] details, including many verbal identities: *Omaha* and *Trouble* also share many identical sequences of identical details. The odds against *Omaha* and *Trouble* sharing so many identical sequences of identical [linguistic] details by chance are almost incalculable." *See* Docket No. 93 at 13. Professor Yerkes has devoted over a hundred hours to this study. Professor Yerkes further opines: I find obvious that Defendant Don Handfield wrote the draft of *Omaha,* the draft of *Trouble with the Curve,* and the draft of his other work (not in dispute) *Touchback*, given to me.

Professor Yerkes has since secured the few written works that are authentic to Mr. Brown, and studied the linguistic details of his writing. He intensely studied the linguistic details (writing DNA) of Mr. Brown's various drafts of Mr. Brown's

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

television script *Curveball*, and the other Mr. Brown scripts *Pug Dog* and *New Catch*.  Professor Yerkes opines for this Court as follows: Again, based upon all my study and research, and based upon my experience, I conclude that Randy Brown is not the author of the script *Trouble with the Curve*.  *See* Yerkes Decl., ¶2.  *See* Docket No. 93 and Yerkes Decl., Ex. 1.

Professor Antonio of NYU's Tisch School of Arts reads thousands of scripts and she gives courses on writing style and can note a writer's style as well as any in her industry.  She undertook to read most of Don Handfield's scripts, and the same or more of Mr. Brown's authentic scripts as Professor Yerkes.  She opines for this Court that Mr. Handfield wrote both *Omaha* and *Trouble with the Curve* and that she came to this conclusion by coming to recognize a distinctive manner  in which Mr. Handfield writes, which involves what she calls a "writing tic."   *See* Docket 96 and Antonio Decl. Ex. 1.

The authorship issue is central to Defendants' Motion based on the prior creation defense.  If one agrees with Professors Yerkes and Antonio that Mr. Handfield, and not Mr. Brown, wrote the draft of *Trouble with the Curve* upon which the infringing film is based, then that would be squarely at odds with any evidence suggesting that Mr. Brown created that script first.

### C. Defendants Have Fabricated the Prior Creation Defense

#### 1.    Forensic Analysis of the Floppy Disks

The Patriot Group is comprised of former members of various United States Government digital investigation and computer forensic teams.  Trevor Reschke is the member of the Patriot Group that carried out the investigation into the floppy disks from which Mr. Brown printed the alleged drafts of *Trouble with the Curve* as to which he and the other persons who have issued declarations on his behalf refer when they testify they read and saw one or more of these drafts back in 1996-2000.  Because no witness to date has offered the original of any documents to which they refer but only copies, the examination of these floppy disks became necessary.  This

was even more so because Defendants offered these floppy discs as dispositive evidence of their prior creation argument.  *See* Reschke Decl. ¶2, Ex. 1.

Mr. Reschke was a Counterintelligence Agent for the United States Army between 1995 and 2001.  He has specialized training in carrying out digital investigations.  Mr. Reschke's experience in digital investigations included his role in the reported analysis of computers belonging to known al-Qaeda terrorists. *See* Reschke Decl., Ex. 1. At points in time, our safety has rested upon Mr. Reschke's computer and digital investigations.  Mr. Reschke's report fully lays out the physical examination first carried out as to the disks, and then the subsequent analysis conducted in accordance with the Daubert standards.  His report is forty-four (44) pages in length and detailed.  His opinion is as follows: The forensic examination conducted on the floppy disks detailed in this report lead me to believe they have been manipulated to provide the appearance of disks used from 1990 to 2003; they contain system information not consistent with the dates of usage suggested by the date time stamp present, manipulated date time stamps, signs of file wiping, and indications of activity that is not plausible.  There are various anomalies and indicators that these discs were manipulated to look as if they were truly being used at the time periods alleged, when based upon our examination this was not plausible or possible for the reasons stated in this report.  *See* Reschke Decl. ¶5, Ex. 2.

Mr. Reschke offers additional specific findings, such as the fact that the discs had inconsistent and not plausible last access times that strongly suggested to Mr. Reschke that date time stamp manipulation had taken place.  This was done by Defendants to give the appearance something was created at a time other than it really was created.[4]  One of the disks had a unique "identification value" that is normally created by a specific system process by an operating system function, but that particular operating system was released publicly after data had allegedly been

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

written to the disk.  Also, manufacturer information from Imation indicates they only made 3M Imation 3.5 inch disks between the years 1999 and 2001.  All files on one of the examined 3M Imation disks analyzed predate this period.  This is simply an implausible observation.  *See* Reschke Decl. ¶5, Ex. 2.

Additionally, Mr. Reschke found that six (6) files have date time stamps that indicate they were written to the disk at speeds that were not possible on the hardware that was used on the dates purported by Mr. Brown.   Also, a unique data pattern was identified on one of the disks that is linked to a "cleaning" or "wiping" scheme.  This was particularly alarming to Mr. Reschke because Mr. Brown testified that he did not know what a "cleaning" or "wiping" system was and had never used one.  More alarming was that Mr. Brown said some "computer professional" showed up at his house, took some discs, never to return them.  *See* Liu Decl, Ex. F, p. 100.

Mr. Reschke further found other inconsistent date of creation time stamps on many of the files, some possessing identical date time stamps which raises all kinds of issues given Mr. Brown testified he simply worked off a standalone desk top on his own.  Of further significance was the observation that one of the disk labels was fastened over and around the protective covering on one disk in such a way it would prevent the disk from being used without cutting the label.  This is due to the protective cover being rendered non-movable eliminating the ability for the disk drive to access the actual disk.  As presented, files were in fact written to this disk over various periods of time, and yet this improperly fastened label that was blocking the disk from being used had file names written on it that were with different inks so as to appear they were written over different times too.  However, this visual presentation of all the different file names written on the label using different inks to suggest the disk was being put in and out over a period of time is not plausible.

---

[4] Counsel requests an evidentiary hearing after a reasonable period for the taking of factual and expert discovery.

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This analysis also uncovered that there was a file present on all of the Macintosh disks that contains data suggesting the original 1st generation of the Macintosh operating system from 1984 was used to create it.  This contradicts the testimony of Mr. Brown as to which computers were used, and when they were used to create the files on these disks.  Additionally, a floppy disc contains a folder named *Trouble with the Curve* that has a creation date of 1993.  Yet, Mr. Brown was very clear in his deposition that he had not considered writing any part of *Trouble with the Curve* until late January 1996.  One cannot create a folder for a project they have not thought of yet. *See* Reschke Decl. ¶ 5, Ex. 2.

**2.    Forensic Analysis of the Spiral Notebooks with Alleged 1997-98 Handwritten Notes and the Circa 1998 Innovative Arts Script**

Larry Stewart is a Chief Forensic Scientist with decades of experience in determining the ages of ball point ink including his work with the United States Secret Service.  Mr. Stewart first physically examined two spiral notebooks turned over to Plaintiffs' counsel months after the Complaint was filed and seemingly in reaction to expert declarations supporting Plaintiffs' Motion for Partial Summary Adjudication in which the point was made that Defendants had yet to produce a single document that could be aged for authenticity.  Shortly after, two spiral bound notebooks full of handwritten notes in all kinds of different inks were made available for inspection out of the blue. Mr. Stewart was retained to do the forensic work. He was first surprised to find sixty (60) pages torn out of the two notebooks. While some tear outs are to be expected this was a high number and hence imprints or "lifts" have been taken to see what was on those pages and that study is underway still.[5]  However, Mr. Stewart went on to age some of the ink on the pages, and he took many, many samples and more than normal, to assure a reliable

_____

[5] Another expert is working on deciphering what was written on the pages torn out.  The hope is that work will be done before the hearing in this matter or any evidentiary hearing set by this Court.

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

process, and he performed very technical tests that are explained in his accompanying report and declaration.  Mr. Stewart found as follows:   It's probable that ink found within Exhibit Q2 and Q3 spiral notebooks was not placed in those notebooks during 1997-1998, but instead within the last two years.  *See* Stewart Decl. ¶169.

He further found upon his investigation that the commercial availability of the spiral notebooks themselves indicates this brand of notebooks were not even available during 1997-1998, the dates written within the notebooks to suggest the date the notes were made. *See* Stewart Decl. ¶22. He also concluded that it was probable the toner used to create the Innovative Arts script of *Trouble with the Curve* supposedly printed out circa 1998 and kept by Mr. Brown at his house is toner from an office machine system that did not even exist in March 1998 (the creation date on the document), but instead was not first commercially available until September 2001. *See* Stewart Decl. ¶23. Mr. Stewart's report is forty six (46) pages in length and in it he walks the Court through the exact samples taken, the chain of custody, the exact aging carried out, and the manner in which his results were obtained consistent with Daubert standards.  In summary, he concludes: After consideration of all of the results, this examiner is virtually certain (highly probable opinion) that the Exhibit Q1 through Q4 document collection was not produced in 1997-98, but instead much more recently.

### 3.      Forensic Analysis of Handwriting on the Floppy Disc Labels

Randy Brown testified that he was the only one to use and label the floppy disks at issue.  *See* Liu Decl. Ex. F, p. 91, ln. 12-14. Frank Hicks, an American Board Forensic Document Examiner, with decades of crime lab experience, examined the handwriting on the limited original documents selectively given in drips and drops to Plaintiffs by Defense counsel.  He has opined that in fact, the labels were written by more than one person, at least two, if not more. *See* Declaration of Frank Hicks ("Hicks Decl.") ¶ 4.

### 4.     Brown's Inconsistent Prior Public Statements

Despite Mr. Brown's claimed authorship of a major motion picture starring Clint Eastwood and Amy Adams, and the fact this lifted him out of a near ten year layoff where he made no money from his writing, the Defendants did not publicize his "from out of nowhere" story at all.  Mr. Brown only gave two interviews and one was at the Santa Barbara Film Festival where Michelle Weisler sat right by his side and answered a lot of the questions for him, and the other was over the phone with a Professor who teaches about sports movies, Robert Edelman *See* Liu Decl. Ex. A, B.

In both interviews, the interviewers pressed Mr. Brown as to when he created the script and also inquired about its relationship to the just previously released film *Moneyball.*  Mr. Brown gave both interviews in October 2012.  He said in both that he wrote the first draft of *Trouble with the Curve* about ten years earlier.  He used the exact same words each time.  *Id.* He made a noticeable effort to place the date of creation one year before the book entitled *Moneyball* was published, and he sure did not say at that time that he had been writing the script for some 16 to 20 years. In the interview over the phone by Professor Robert Edelman, Mr. Edelman asked Mr. Brown how he knew to write about scouting, and Mr. Brown said he was "embarrassed to admit" he had never met with a scout or gone to see them at work, or gone to a game with them.  *See* Liu Decl. Ex. B Now, Mr. Brown is stating he first wrote the script that became the movie *Trouble with the Curve*  in 1993 or 1996. *See* Liu Decl. Ex. F, p. 108, ln. 18-20. That is a sea change, and Mr. Brown had no explanation for it in his deposition, but rather admitted he was being honest when interviewed.

### 5.     The "Smoking Gun" *Moneyball* Scene

Whoever of the named Defendants (and those who have yet to be named) made the decision to use Mr. Brown's unheralded comedy called *Trouble with the Curve* to house the copied father/daughter baseball story from *Omaha*, and to cloak

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   it in a different baseball backdrop, necessarily made the decision to ditch the

2   college baseball back story found in *Omaha* and go with an MLB scouting

3   backdrop.  Yet, none of them apparently knew the first thing about professional

4   scouting.  As luck would have it for them, a year before *Trouble with the Curve*

5   went into production, the very successful film *Moneyball* had been released.  The

6   film, based loosely on the book of the same title, featured a character modeled after

7   Paul DePodesta:  a young Ivy League graduate, carrying a wireless lap top

8   everywhere he went, spouting out statistics and relying on the computer and those

9   advanced statistical baseball metrics to evaluate players. *See* Docket 66-4 at 3,

10  Docket 66-5 at 2, Liu Decl. Ex. D. Whoever copied the *Omaha* father/daughter

11  baseball drama seems to have borrowed a bit from *Moneyball* too.  There is a scene

12  in nearly all the scripts Defendants fabricated to look like progressive drafts

13  prepared from 1996- 2000 that depicts a young Scouting Director carrying around a

14  wireless lap top, and talking about real time "look-ins" to low level minor league

15  games.  That character is named Phillip in the scripts at issue and he argues in many

16  scenes that one can use the statistical metrics of a player's performance taken off

17  the laptop to scout and evaluate the player.  This becomes a debate in the film.

18  While these *Moneyball*-like scenes are in scripts printed off of Mr. Brown's floppy

19  discs with alleged creation dates of 1996-2000, these scenes could not have been

20  written any earlier than 2004.

21          For anyone familiar with the Michael Lewis book entitled *Moneyball*

22  released in 2003, and released as a movie September 2011, this scene touches on a

23  phenomena started in secret by Billy Beane and Paul DePodesta within the Oakland

24  Athletics scouting department, where DePodesta employed a laptop, some

25  advanced software and baseball  statistics.  Then, Mr. Lewis chose to investigate

26  how it was the Oakland Athletics, a small market team, were winning so many

27  games.  Mr. Beane and the Oakland Athletics chose to allow only Mr. Lewis to see

28  what they were doing, which was unheard of: using Ivy League graduates to read

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

saber-metrics off their wireless lap top to make judgments on players to be drafted. Mr. Lewis realized he was seeing something that would change baseball forever and he worked in strict confidence about this process until he published the book entitled *Moneyball* in 2003.  This set off a debate within the "old school" executives of the MLB and the new kids on the block with their lap tops and advanced statistical metrics. *See* Docket 66-4 at 3, Docket 66-5 at 2. The point is that this *Moneyball* scene starts showing up in early drafts printed out from Mr. Brown's suspect floppy discs. Mr. Brown dated the origination of these scenes under oath as 1997-98 – six or seven years before anyone knew about this new phenomenon.  *See* Liu Decl. Ex. F, p. 206, ln. 1-4. Mr. Brown could not write about something he could not have known would occur.

### 6.  Brown Does Not Recall Motivation for Characters, When Scenes Were Written, Which Fabricated Script is Which

As for the primary story line -- the dysfunctional father/daughter relationship, the tug of the father's age and illness upon the daughter and their conflicted experience as she moves back into her father's baseball life in the last year of a long career -- Mr. Brown admits he didn't conceive any of that. *See* Liu Decl. Ex. F, p. 272, ln. 17-19. He suggests nameless, faceless persons in UCLA extension writing courses on their own suggested that he radically change his light hearted *Trouble with the Curve* comedy into a gripping, father/daughter baseball story rife with conflict and drama. *Id* at p. 125, ln. 12-15. Mr. Brown simply never was able to give credence to the notion he thought of this story line in his own head.  *Id* at p. 245, ln. 23-25. Contrast this with Plaintiff Brooks' explanation that his unique and copyrighted story was born in his mind when his mother, while dying, shared she grew up an only child and daughter estranged from her father, and how much this haunted her. *See* Docket 99 at 2-3, 7.   That story has specific roots that are genuine.

Mr. Brown could not remember the motivation for any of the characters. When asked how he came up with the high school baseball third base recruit Bo, he

said he was born out of thin air, and not based on any research: "not based upon anyone." *See* Liu Decl. Ex. F, p. 263, ln 6-8. Even though he claims he made this script his life for 16 plus years, he simply could not identify the time periods, other than in the most wildly general sense, of when the scenes that formed the August 25, 2011 production script were written, or what independent motivation he himself had when writing them. *See* Liu Decl. Ex. F, p. 180, ln. 9-13; p. 189, ln. 25; p. 257, ln. 2-12; p. 263, ln. 6-8;  p. 296, ln. 1. He did, however, take credit for the creative decision that the father figure would smoke a cigar *See* Liu Decl. Ex. F, p. 187, ln. 7-9. (Found in Plaintiffs' copyrighted concept reel given to Defendant Handfield). *See* Brooks Decl. ¶10. But Defendant Robert Lorenz has stated publically that was his idea. The conflict between the untold stories told by the defendants is common.[6]

### 7.    Brown did Not Know the Subject Matters of the Screenplay and Admitted to doing Absolutely No Research

Mr. Brown admitted he never played third base himself (the position the recruited player "Bo" plays in the movie) as he gave up baseball when young for acting. *See* Liu Decl. Ex. F, p. 20, ln. 10-11. He admitted to not knowing a scout beyond one he claims to have called, at some unknown point, to talk over the phone for just a few minutes, about things he cannot recall. *Id* at  p. 213-214. He never went to meet with a scout or to watch a game with one, or set a meeting with anyone involved in Major League Baseball, and admits to doing no research on these topics, at all, until talking with scouts hired by Defendant Warner Brothers when the film was already being shot. *Id* at  p. 199, ln. 8-17; p. 215, ln. 18-22. He admitted he never attended a minor league, high school or college came at or near the time he was writing these scripts, if ever. *Id.* p. 263, ln. 11-15.

---

[6]  For example, Mr. Brown claimed that Defendant Jay Cohen knew his script cold and was pitching it himself once he was with Kurt Russell's and Goldie Hawn's production company, Cosmic Entertainment, but Mr. Cohen said he did no such thing but that a woman in their TV Department was striking out trying to get Mr. Brown's  light, comedy picked up for a TV show or TV movie.  Mr. Cohen admitted to not recalling the scenes within the scripts produced

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## D. **Brown Admitted Others Advised Script Changes in 2011 to Turn The Light Comedy into a Tugging Drama**

Importantly, throughout Mr. Brown's deposition, he admitted that many scenes were either written for the first time or rewritten to add drama and conflict to the father/daughter story in 2011.  That would be many years after Defendants had access to *Omaha* (and they did because Mr. Handfield wrote both that script as a work for hire, and the script from which the movie *Trouble with the Curve* was made.  Also, Defendant Ferraro, who also represents Mr. Brown, had access to *Omaha* through his representation of Mr. Handfield.)  These additions and rewrites were not trite.  They involved ditching some of the vestiges of Mr. Brown's "cartoonish" scenes from the original comedy he wrote, and replacing it with more father/daughter conflict scenes straight from *Omaha*.  Mr. Brown admitted the film that became the movie needed to make a sharp turn into a father/daughter baseball drama, and that he did a lot of that writing in 2011 with Ms. Weisler. *See* Liu Decl. Ex. F, p. 125, ln. 12-15; p. 159, ln. 21-25; p. 197, ln. 1-14.

## E. **Brown Registered Other Works, but not This Script**

Defense counsel wish to ignore entirely the evidentiary significance of the fact that Mr. Brown testified openly in his deposition he himself had a practice of registering his few purchased spec scripts with the Writer's Guild, *Id* at p. 84, ln. 2-6, and that he had representation capable of registering his scripts with the Copyright Office. *Id*. He even admitted he knew of the practice of sending a script to one's self in a postmarked, sealed envelope and not opening it unless needed.  However, he just as openly admitted that not a single draft of the scripts he has put forth by way of his floppy disks was ever registered. *Id* at p. 144, ln. 10-16, p. 146., ln. 1, p. 157, ln. 14-16; p. 168, ln. 8-12. He has no explanation.

by Mr. Brown.  *See* Liu Decl. Ex. F, p. 154-156; Liu Decl. Ex. G, p. 55-59

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**F.** __The Defense Declarations Are Tied to Fabricated Evidence and Reliant Thereon__

Each of the Defense declarations fails to attach or offer for inspection an original document.   They each have infirmities.  Mr. Landau says that Mr. Brown took his formal class at UCLA extension around 1992 or so. *See* Docket 100 at 2. But Mr. Brown was reminded through documents given to him at his deposition that he did not walk into Mr. Landau's class until January 18, 1996. *See* Liu Decl. Ex. F, p. 108, ln. 18-20.  Mr. Brown and Mr. Landau are so tight that Mr. Brown endorsed Mr. Landau's book entitled *A Screenwriter's Roadmap*, and admitted he did so without reading the book. *Id* at p. 86, lines 1-5. Mr. Landau does not address any of the specific scenes that Plaintiffs claim were infringed, nor do any of the others who gave declarations.  Mr. Sheinberg offers a picture of a bound script he supposedly has but has not produced the actual document.

Ms. Gadsby writes a short declaration in which she states she was doing freelance work for the Bubble Factory at the time she provided the coverage report (handed over quite a bit after the Complaint was filed) on Mr. Brown's script.  She says she sent the coverage report by fax from a friend's office at Everest Pictures. What Ms. Gadsby fails to share with the Court is that in point of fact during the time she was supposedly doing coverage work for the Bubble Factory she was in truth heading up Oliver Stone's production company, Illusion Entertainment.  Her own LinkedIn account shows that she herself did work for Everest but that was back in 1993-1995 (before Mr. Brown says he wrote the script.).  The idea that Ms. Gadsby would be working for a direct competitor of the Bubble Factory in a high level job for a demanding director/producer, and still be sending out a coverage report to the Bubble Factory for a script penned by an unknown writer is farfetched. The idea she would leave her own office and send it from another competitor's office by fax at 7:30 p.m. at night is a stretch too.  While Ms. Gadsby says that she sent it from a "friend's office," she intentionally does not name the friend.   Plus,

1  her claimed coverage report is supposed to be about the script given Mr. Sheinberg,
2  but neither her report nor his declaration square.

3  Given Plaintiffs' forensic experts opine in detail that Defendants' evidence
4  is fabricated, and the floppy discs are compromised, manipulated and fabricated.
5  (*See* Reschke Decl. Ex. 1, Stewart Decl., Hicks Decl.), all of this evidence becomes
6  suspect.   Further, all these declarations are also squarely at odds with the opinions
7  of Professor Yerkes and Antonio that Don Handfield unequivocally wrote the script
8  from which the movie *Trouble with the Curve* was made, and Brown's own public
9  statements he did not start writing these scripts until 2002, and the fact that every
10 one of the scripts referenced has a scene right out of the book/movie *Moneyball*
11 which could not have been written by anyone until 2004-2005.

## III.   Legal Argument

### A. The Facts Are to Be Viewed In a Light Most Favorable to Plaintiffs

15 The law requires that when the court is considering a case dispositive motion
16 such as this, it is to review the facts in a light most favorable to the nonmoving
17 party.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U. S. 574, 587
18 (1986); *Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994).   This would
19 entail considering all the expert reports and other facts presented. [7]

### B. Defendants Failed to Carry Their Burden to Prove Plaintiffs Copied Their Alleged Prior Creation/Work

22 Under 17 U.S.C. § 410(c) Plaintiffs' registration certificate constitutes prima
23 facie evidence of the validity of the copyrights in *Omaha*.  *North Coast Industries*
24 *v. Jason Maxwell, Inc.,* 972 F.2d 1031, 1033 (9th Cir. 1992).  Since originality is
25 required for validity, the copyright registration certificate is prima facie evidence of
26 originality. *Smith v. Jackson*, 84 F.3d 1213, 1219 (9th Cir. 1996); *Masquerade*

27

28 [7] This includes the declarations of David Yerkes, Gerard Fox, Gerald Hunsicker, Jeffrey Liu, Richard Walter, Ryan Brooks, Sheril Antonio, Trevor Reschke, and Tal Smith filed in support of Plaintiffs' Motion for Summary

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Novelty v. Unique Industries*, 912 F.2d 663, 669 (3d Cir. 1990). To overcome the burden of this statutory presumption of originality, Defendants must prove that Plaintiffs' product was copied from a prior source. *North Coast Industries, supra*, 972 F.2d at 1033; *Masquerade Novelty, Inc.*, supra, 912 F.2d at 669.  Defendants must show that plaintiffs copied the "idea" of the prior source and its "expression." *North Coast Industries*, id.; *Leeds Music Limited v. Robin*, 358 F.Supp. 650, 659–60 (S.D.O. 1973).  Defendants have made no such showing and thus have not made the required showing under the summary judgment standard articulated herein above.

## C. Defendants' Cited Cases Are Distinguishable

None of the cases cited by Defendants presented the type and depth of forensic reports, expert opinions and fact based declarations as has been presented to the Court in this instance and certain of those cases involved rulings after discovery.  For example, Defendants cite *Cottrill v. Spears*, 87 F. App'x 803 (3d Cir. 2004), a case in which the court granted summary judgment in favor of the Defendant where there was testimony that singer Britney Spears created her work before the Plaintiffs' work was created.  Unlike in *Cottrill*, here due to the results of forensic testing it is in dispute whether the earlier-created scripts are genuine. Further, if parts of *Trouble with the Curve* were indeed, as Plaintiffs contend, created after *Omaha*, then there still remains the issue of potential copying and similarity of the resulting work.  Defendants' other cases are distinguishable as well.  See *Fogerty v. MGM Grp. Holdings Corp.*, 379 F.3d 348 (6th Cir.2004)(where, unlike here, Plaintiffs did not offer evidence to support the proposition that the works are so strikingly similar that copying was the only plausible explanation of the similarities); *Bauer v. Yellen*, 548 F. Supp. 2d 88 (S.D.N.Y. 2008)(a case in which the Defendants' script had five prior registrations with the WGA, whereas here, there are no prior registrations); *Weygand v. CBS*,

Adjudication  which are incorporated herein by reference.

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  1997 U.S. Dist. LEXIS 10613 (C.D. Cal. May 20, 1997)(which notes that summary

2  judgment is inappropriate where, as here, credibility is at issue); *Bernal*, 788 F.

3  Supp. 2d at 1054-55 (where, unlike here, the evidence that Defendants wrote earlier

4  drafts was undisputed); *Armour*, 512 F.3d at 154 (where, unlike here, the time

5  stamps on disks introduced as evidence were un-rebutted).

6              **D. There Exist Many Controverted Facts**

7        Defendants have not opposed Professor Yerkes' and Professor Antonio's

8  opinions and reports, each now having authored two, and their opinion that Don

9  Handfield is the author of *Trouble with the Curve*, and that Mr. Brown is not.  Also,

10 notably, the forensic experts have offered clear and convincing proof that the

11 evidence upon which Defendants' motion is based is compromised and fabricated.

12 Mr. Brown's own inconsistent statements and the implausible contention he wrote

13 scenes about things about which he knew nothing, and about things that were not

14 yet known to anyone raises many genuine issues of material fact.  Mr. Brooks and

15 Mr. Brown, and Mr. Handfield by implication, and the rest of the defendants by

16 association, disagree over whether the father/daughter story in *Trouble with the*

17 *Curve* is the one copyrighted and owned by Plaintiffs.  There are a myriad of issues

18 that surround who wrote what and when.  What should take place is a jury trial in

19 the next six months.

20              **IV.   CONCLUSION**

21       For the foregoing reasons, the Warner Defendants' Motion for Summary

22 Judgment should be denied.

23                              LAW OFFICES OF GERARD FOX, INC.

24

25 Date:  January 27, 2014

26                              _____

27                                    GERARD P. FOX
                                 Attorney for Plaintiffs Gold Glove
28                               Productions, LLC and Ryan A. Brooks

PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is: Law Offices of Gerard Fox, Inc., 1880 Century Park East, Suite 600, Los Angeles, CA 90067.

On January 27, 2014, I served the following documents entitled:

**PLAINTIFFS' OPPOSITION TO WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

on the person(s) listed in the attached Service List.  The documents were served by the following means:

| | |
|---|---|
| ☐ | **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collections and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business. |
| ☐ | **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid. |
| ☐ | **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid. |
| ☐ | **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list. |
| ☐ | **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express of delivered to a Federal Express courier, at Los Angeles, California. |
| ☐ | **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list. |
| ☐ | **FAX:**  By transmitting the document by facsimile transmission. The transmission was reported as complete and without error. |
| ☒ | **By CM/ECF Electronic Service:**  I caused such document to be served via the Court's (NEF) electronic filing system on all registered parties. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2014

_____

Cindy Hamilton

## <u>Service List</u>

| | |
|---|---|
| Joseph P. Costa<br>Costa Abrams & Coate LLP<br>1221 2nd Street<br>Third Floor<br>Santa Monica, California 90401<br>Fax: 310 576-6160 | Attorney for The Gersh Agency and Jay Cohen |
| Bryan Joel Freedman/ Jesse Kaplan<br>Freedman & Taitelman, LLP<br>1901 Avenue of the stars, Ste. 500<br>Los Angeles, CA 90067<br>Fax: (310) 201-0045 | Attorneys for United Talent Agency and Charles Ferraro |
| Matthew Kline/ Ashley Pearson<br>O'Melveny & Myers LLP<br>1999 Avenue of the Stars, 7th Floor<br>Los Angeles, California 90067<br>Fax: (310) 246-6779 | Attorneys for Warner Bros. Pictures Inc., Malpaso Productions, Ltd., Warner Bros. Distributing Inc., Warner Bros. Home Entertainment Inc., Warner Bros. Domestic Television Distribution, Inc., TW UK Holdings, Inc., Robert Lorenz, Michele Weisler, and Randy Brown |
| Dale Robert Dela Torre/ Colby Petersen<br>Jacobson, Russell, Saltz, Nassim& De La Torre<br>10866 Wilshire Blvd Ste 1550<br>Los Angeles, CA 90024<br>Fax: (310) 446-9909 | Attorneys for Don Handfield and Tressa Difiglia Handfield |