DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com (Lead Counsel)
ASHLEY PEARSON (S.B. #281223)
  apearson@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:   (310) 553-6700
Facsimile:    (310) 246-6779

Attorneys for Defendants
Warner Bros. Studio Enterprises Inc.,
The Malpaso Company, Inc., Warner Bros.
Distributing Inc., Warner Bros. Home
Entertainment Inc., Warner Communications
Inc., TW UK Holdings Inc., Robert Lorenz,
Michele Weisler, and Randy Brown

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLD GLOVE PRODUCTIONS, LLC, a California Limited Liability Company and RYAN A. BROOKS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>DON HANDFIELD, an individual, TRESSA DIFIGLIA HANDFIELD, an individual, RANDY BROWN, an individual, MICHELE WEISLER, an individual, CHARLES FERRARO, an individual, JAY COHEN, an individual, ROBERT LORENZ, an individual, UNITED TALENT AGENCY, INC., a California corporation, THE GERSH AGENCY, a California corporation, WARNER BROS. PICTURES INC., a Delaware corporation, MALPASO PRODUCTIONS, LTD., a California corporation, WARNER BROS. DISTRIBUTING INC., a Delaware corporation, WARNER BROS. HOME ENTERTAINMENT INC., a Delaware corporation, WARNER BROS. DOMESTIC TELEVISION DISTRIBUTION, INC., a Delaware corporation, TW UK HOLDINGS, INC., a Delaware corporation, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.  CV13-07247-DSF (RZx)<br><br>**WARNER DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PRIOR CREATION GROUNDS**<br><br>FILED HEREWITH: THE DECLARATIONS OF ASHLEY PEARSON AND JAMES PEARL; WARNER DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT AND WARNER DEFENDANTS' REPLY IN SUPPORT OF CONCLUSIONS OF LAW; WARNER DEFENDANTS' RESPONSES TO PLAINTIFFS' OBJECTIONS TO DEFENDANTS' SUPPORTING DECLARATIONS; WARNER DEFENDANTS' OBJECTIONS TO EVIDENCE IN PLAINTIFFS' STATEMENT OF GENUINE |

1
2
3
4
5
6
7

ISSUES OF MATERIAL FACT IN SUPPORT OF THEIR OPPOSITION TO THE WARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Hon. Dale S. Fischer

Hearing Date: February 24, 2014
Hearing Time: 1:30 p.m.
Courtroom: 840

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I. Introduction .......................................................................................... 1

II. The Undisputed Evidence Entitles Defendants To Judgment ........................ 3

III. Plaintiffs' Strawman Attacks Are Irrelevant And Without Basis ................... 7

IV. Conclusion ........................................................................................... 12

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bethea v. Burnett*,
  2005 WL 1720631 (C.D. Cal. June 28, 2005) .................................................. 6

*Ceglia v. Zuckerberg*,
  2013 WL 1208558 (W.D.N.Y. Mar. 26, 2013) ................................................ 7

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) .......................................................................... 3

*Lake Forest Master Cmty. Ass'n v. Orlando Lake Forest Joint Venture*,
  No. 07-CA-1867-L (Fla. Cir. Ct. Apr. 20, 2010) ............................................. 7

*Moore v. Lightstorm Entm't*,
  2014 WL 201579 (D. Md. Jan. 17, 2014) ...................................................... 11

*Muller v. Twentieth Century Fox Film Corp.*,
  794 F. Supp. 2d 429 (S.D.N.Y. 2011) .............................................................. 6

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
  701 F.2d 95 (9th Cir. 1983) .............................................................................. 4

*Selle v. Gibb*,
  567 F. Supp. 1173 (N.D. Ill. 1983), *aff'd*, 741 F.2d 896 (7th Cir.
  1984) ................................................................................................................. 6

*Shlimovich v. Cheban*,
  2013 WL 5211725 (Cal. App. 2d Sept. 17, 2013) ........................................... 7

**OTHER AUTHORITIES**

*In re Thereza Imanishi-Kari, PhD*,
  DAB Docket No. A-05-33, Nat'l Inst. of Health Appeal Ruling,
  Dec. No. 1582, 21 June 1996 ........................................................................... 7

**RULES**

FED. R. EVID. 702 ............................................................................................. *passim*

## I. Introduction

Plaintiffs' opposition to the Warner Defendants' prior-creation summary judgment motion is the classic strawman—attacking evidence that the Warner Defendants did not submit in support of their motion, and ignoring the undisputed evidence that they did submit, all of which shows, in extensive, undisputed detail, how Randy Brown completed and sold *Trouble with the Curve* in the late 1990s.

1. This still-undisputed evidence shows that each element of *TWTC* that plaintiffs claim was copied from *Omaha* existed in *TWTC* a decade earlier. Most critically, plaintiffs do not dispute Appendix 1 of defendants' motion, DN 98-2, which shows how every element that plaintiffs claim was copied from their 2005 *Omaha* script appears in the September 1997 *TWTC* draft that the Bubble Factory optioned. Plaintiffs offer no evidence disputing the authenticity of this 1997 script or the sworn testimony authenticating it. Nor do plaintiffs challenge the abundant other prior-creation evidence the Warner defendants submitted: *e.g.*, other hard-copy *TWTC* scripts from the 1990s; a 1997 "Coverage Report" detailing *TWTC*'s contents; letters promoting *TWTC* in the 1990s; or an article predating this lawsuit in which Neil Landau described his work with Brown on *TWTC* in the 1990s.

Plaintiffs' only challenge to this evidence comes at pages 23 and 24 of their brief, where they suggest that the third-party witnesses who submitted the evidence are "biased." Yet as Ninth Circuit law makes clear (and plaintiffs do not dispute), such bias claims are not a valid basis to either defeat or delay summary judgment.

2. This is where this Court's analysis should begin and end. None of plaintiffs' supposed forensic "experts" ever addresses any of this evidence. Their supposed content experts ignored it, too, and their opinions are flatly inadmissible, as they apply subjective, unrepeatable "similarity" and "authorship" tests that are untethered to copyright law. Indeed, courts have rejected these very "experts" opinions and methods in cases just like this one—and yet, the experts admit that they used the very same discredited methods again here.

3. Rather than show triable fact issues on the evidence defendants actually offered, plaintiffs seek a hearing on *other uncited* evidence, calling it a fraud. Such claims are irrelevant and recklessly false. Indeed, the report of plaintiffs' document "expert" is nothing short of sanctionable. Rejected by courts across the country and terminated by the Secret Service when charged with perjury, Larry Stewart has been roundly criticized by courts for "manipulating" evidence and giving "useless," "misleading" opinions. Here, he attacks two spiral notebooks that Brown produced after defendants moved for summary judgment that contain his early notes on *TWTC* from the 1990s. Stewart called the notebooks fakes, but when deposed, conceded he mistakenly contaminated the ink-testing machine he used to justify this claim. Stewart also said the notebooks were frauds because they commercially unavailable in the 1990s. This, too, is abjectly false, as public archives show.

Plaintiffs' computer expert, Reschke, has never submitted an expert report before and concedes he did not write large portions of his report. When confronted with alternative explanations for key opinions, he said he did not know and needed to talk to his colleague, who wrote large portions of his report (yet is neither disclosed as an expert nor a signatory to the report). When Reschke was shown that the dating anomalies he cited were *not* the result of manipulation, but instead, *e.g.*, reflected original factory date-stamps, he disclaimed his expertise and asked to talk to his co-author and another unnamed consultant whom he has never even met. To the extent Reschke did have knowledge, he concedes there were no "anomalies" in 5 of the 7 disks cited in defendants' motion—and *none* showed indicia of any fraud.

4. That is the sum and substance of plaintiffs' opposition: targeting evidence defendants never cited in their motion; falsely attacking strawmen and ignoring the actual cited evidence; and hoping to confuse the Court. The Court need not address these sideshow attacks to grant this motion or bring this wasteful case to its much-needed end. It need only rely on undisputed evidence—attested to by third-party witnesses—that Brown wrote *TWTC* in 1997, years before *Omaha* was conceived.

**II. The Undisputed Evidence Entitles Defendants to Judgment.**

A. On November 8, 2013, the Warner Defendants provided plaintiffs with all of the declarations and exhibits on which this prior-creation motion for summary judgment relies. DN 98-1 Ex. G. Warner agreed to give plaintiffs three months to respond and to take any allegedly needed discovery. DN 114 at 1:10-2:9; 147. Defendants' prior-creation motion was premised on *one* material fact—*i.e.*, that "Brown completed drafts of [*TWTC*] in 1997 and 1998, years before Plaintiffs conceived or wrote *Omaha*," DN 98-4 at 1—and one well-established copyright rule—*i.e.*, "it is impossible to *copy* something that does not yet exist." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002); DN 98 at 7 n.6 (collecting cases).

Appendix 1 to the motion showed how each of the 30-plus elements that *TWTC* allegedly copied from *Omaha* appeared in a September 1997 *TWTC* script that Brown gave The Bubble Factory, DN 98-2—a script The Bubble Factory had analyzed in a September 14, 1997, "Coverage Report." DN 101 ¶¶ 4-8 & Exs. A, Q, B (Bill Sheinberg authenticating Sept. 1997 script and "Coverage Report").

In the three months they had to respond, plaintiffs did *nothing* to contest Appendix 1, Sheinberg's declaration, the September 1997 script, or the Coverage Report. They never deposed Sheinberg; never inspected originals of his exhibits (despite offers to do so, DN 147-1 ¶ 4, Ex. A); never deposed Carrie Gadsby, who authored and authenticated the Coverage Report, DN 112 Ex. Y; and did not give copies of the script and report to their experts. Pearson Decl. ("PD") Ex. H at 451:11-452:6; Ex. I at 471:15-472:25; Ex. K at 735:6-15 (got report, not script).

Instead, on the day that their opposition brief was due, plaintiffs accused Sheinberg (a respected third-party lawyer and entertainment executive) and Gadsby (a respected non-profit executive) of being "highly biased," DN 132 ¶¶ 6, 9, 10 (Fox Decl.), and of submitting declarations "Tied to Fabricated Evidence," DN 120 at 22:1-24:11. These unsupported, irresponsible accusations are wholly inadequate to defeat summary judgment, as are plaintiffs' pleas for a continuance. DN 147 at

3-7. Claims of bias are *neither* a ground to defeat summary judgment, *nor* a basis to delay resolving such motions. *Id.*; DN 98 at 14:8-15:3 & n.10 (collecting cases; *e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment").

B. Likewise, plaintiffs cite no evidence to contest the extensive other evidence that third-party declarants Sheinberg, Marcy Morris, Gerard Boccaccio, and Neil Landau submitted to the Court. That also-undisputed evidence includes:

- A series of contracts between the Bubble Factory and Brown starting in 1997, in which the Bubble Factory optioned *TWTC*, *see* DN 101 ¶¶ 8-9 & Exs. D, E, G-H (Sheinberg); DN 103 ¶¶ 2-7 & Exs. A & B (Morris);
- Four other hard-copy drafts of *TWTC* from 1997 and 1998, *see* DN 101 ¶¶ 10-11 & Exs. C, F, S, U, V, W; DN 103 ¶¶ 2-7 & Ex. C;
- Eight submission letters sent by the Bubble Factory, between 1997 and 2001, to market *TWTC* to third parties, *see* DN 101 ¶¶ 12-13 & Exs. I-P; DN 102 ¶¶ 5-6 (Boccaccio authenticating letters as well); and
- Landau's 2012 article discussing how he worked with Brown on *TWTC* more than "12 years" earlier at UCLA, DN 98 at 9:17-13, Ex. C at 237.

Plaintiffs' opposition addresses *none* of this evidence. Yet each piece of it—on its own, and especially when taken together—defeats plaintiffs' claims. DN 98 at 6-9, 13-16 (collecting cases concerning quantum of proof necessary to prevail on prior-creation motion). Plaintiffs have long been on notice of this evidence. In October, days after this case was filed, we sent them a February 1998 *TWTC* script from Morris' files, DN 103 Ex. C, along with a detailed chart showing how it contained every element that plaintiffs alleged was copied from *Omaha*. DN 98-1 ¶ 4 & Ex. B at 45-49. Plaintiffs offer *no* response. They also have no response to The Bubble Factory's 1997-2001 submission letters. This concession is fatal, too.[1]

---

[1] Each letter summarizes Brown's *TWTC* script as of the date sent, showing how plaintiffs' claims of copying in the late-2000s are baseless. DN 98 at 11-12, nn.7-8. Plaintiffs' experts concede the letters accurately summarize the story in the 2011

   C. Plaintiffs never take any of the above evidence head-on, but do take three swipes at it. *First*, they submit 14 pages of objections to the declarations, DN 120-3, yet *not one* specifically addresses the 20-plus documents cited above, sworn to by the declarants. Instead, the objections (erroneously) contest random, immaterial sentences in the declarations or generally cry fraud, citing no proof. DN 167 at 1-7.

   *Second*, plaintiffs claim that, at his deposition, Brown could not "remember the motivation for any" *TWTC* character; that he did insufficient research to write a baseball movie; and that others gave him notes that he used in the script in 2011 before the movie was shot. DN 120 at 19:12-21:15. These attacks change nothing: They misstate Brown's testimony, *e.g.*, PD Ex. F at 353:12-15, 358:7-8, 376:1-14, 379:17-380:2, 381:14-17, 382:22-383:1 (explaining evolution of Gus-Mickey relationship and genesis of scenes), and ignore that *TWTC* is fiction. To write about a third baseman, Brown did not need to play third base or meet many scouts—no more so than George Lucas needed to blow up the Death Star. In addition, the 2011 changes that plaintiffs mention are, by definition, immaterial. As Warner showed in Appendix 1 to its motion—which plaintiffs *never disputed*—all of the elements that plaintiffs say are copied appear in Brown's 1997/1998 *TWTC* drafts. DN 98-2.

   *Last*, plaintiffs suggest that if the testimony of their "authorship" experts is credited, it would be at "odds with evidence suggesting that Mr. Brown created" *TWTC* in the 1990s. DN 120 at 12:14-18, 23. Not so. Yerkes conceded he did not dispute any of defendants' prior-creation evidence, as did Antonio. PD Ex. K at

---

*TWTC* script they reviewed, and yet none of the experts was provided these letters, or most of the evidence above. PD Ex. H at 451:11-452:6, 454:9-13, 463:13-464:6, 467:20-469:16, 475:13-478:5, 479:21-483:8, 485:11-504:22, 505:4-25, 510:16-512:11, 513:20-540:12; K at 684:7-690:17, 698:1-709:17, 711:15-715:18, 716:1-720:3, 722:10-728:23, 730:6-24; I at 590:17-602:17, 606:11-608:25. Having seen the evidence, the experts concede they dispute none of it. *Id.* Walter also concedes he has known Landau for years, loves him, knows him to be truthful, and does not dispute any facts in Landau's declaration—save for titles Landau used for him and Walter at UCLA. *Id.* Ex. H at 456:5-18, 460:7-10, 461:2-462:18. Walter also knows Sheinberg and does not think he is biased and does not dispute his testimony. *Id.* at 459:10-18, 503:13-504:22, 506:24-507:3.

686:25-691:24, 727:16-21, 730:17-731:23; I at 587:9-14; 626:18-627:7. That plaintiffs had their experts assiduously avoid undisputed evidence—sworn to by third-parties—compels that their reports be excluded. Such opinions fail to "fit" the record facts and are barred by Rule 702. DN 110 at 2, 14.

Indeed, courts in copyright cases employ a simple rule to avoid the problem posed here—*i.e.*, a party paying experts (here, $20,000 to $60,000 *each*, PD ¶ 11) to disregard prior-creation evidence and argue that triable issues of fact exist based on the experts' *ipse dixit* opinions. Courts in copyright cases disregard such opinions and grant summary judgment because "the law does not permit the oath of credible witnesses, testifying to matters within their knowledge, to be disregarded" based on contrary "opinion[s] of an expert." *Selle v. Gibb*, 567 F. Supp. 1173, 1182 (N.D. Ill. 1983), *aff'd*, 741 F.2d 896 (7th Cir. 1984); DN 110 at 2-3, 4-9, 11, 15-18 (collecting more cases). Indeed, it is *plaintiffs'* burden to show their experts meet the dictates of Rule 702 and copyright law. They come nowhere close. DN 110.[2]

In sum, the Court should grant the summary judgment for defendants based on the undisputed prior-creation evidence detailed above.[3]

---

[2] As confirmed at deposition, the only time Yerkes ever tried to testify in a movie-script authorship case, Judge Chin rejected his opinions and methods, calling them "inherently subjective and unreliable." *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 443, n.5 (S.D.N.Y. 2011). Yet Yerkes admits he used the same methods here. PD Ex. I at 16:2-8, 17:17-19:15, 22:14-26:12, 27:20-29:20.
The same for Prof. Walter. The last he testified, Judge Walter (no relation) rejected his opinions and methods as untethered to copyright law. *See Bethea v. Burnett*, 2005 WL 1720631, at *10-15, n.11 (C.D. Cal. June 28, 2005). Prof. Walter did not change his approach here because, he says, he was unaware of the ruling and Judge Walter is "wrong." PD Ex. H at 439:8-446:12, 509:10-23. Antonio has never been qualified as an expert in authorship, and admits she adhered to none of the copyright rules governing expert testimony in cases like this, because she was not told them. *Id*. Ex. K at 691:17-693:24, 698:17-25, 738:23-739:3.

[3] That is especially true, whereas here, there is no evidence Brown ever heard of *Omaha* before this case was filed. DN 98 at 9:17-23, 15:4-16:5. Plaintiffs' only basis to claim that Brown had the required "access" is to assert—without any cite to evidence—that Brown and Handfield shared the same agent. DN 120 at 10:6-7. But as the undisputed record evidence shows, Brown first met his agent *after* he sold *TWTC* to the other Warner Defendants in 2011. PD Ex. F at 344:18-345:2.

### III. Plaintiffs' Strawman Attacks Are Irrelevant and Without Basis.

Plaintiffs spend 18 pages of their brief attacking irrelevant evidence on which defendants' prior-creation motion does *not* rely. Each attack is legally baseless.

**A. Plaintiffs' Putative Document Expert.** Stewart offers opinions about four documents produced by Brown (Q1-Q4), DN 123 ¶¶ 16-26—*none of which* defendants proffered in their prior-creation motion. Stewart's report is irrelevant, as it does nothing to address the undisputed evidence detailed in Part II above. It can also be excluded under Rule 702 and *Daubert*, and defendants move to strike it.

1. In alleging "fraud" and "fabrication" (in their briefs and to the press), plaintiffs tout Stewart's credentials. DN 120 at 2-3; 15-16. His report has eight pages lauding his experience, DN 173 ¶¶ 2-12, but tellingly omits that the Secret Service *terminated* Stewart after the DOJ prosecuted him for perjury. PD G at 401:11-403:20. This is by no means Stewart's only black mark. Courts around the country have derided his testimony as "useless" and "useless,"[4] "misleading,"[5] and "unpersuasive."[6] Worse still, courts and tribunals have found that he "manipulated"[7] evidence and altered his working notes.[8]

2. The only peer-reviewed science Stewart used in this case was testing for the levels of phenoxyethanol ("PE")—a solvent present in ink that dissipates over time—to determine the age of three documents: Q1-Q3. DN 173 ¶¶ 94-96.[9] Based

---

[4] PD Ex. C at 183 (*Lake Forest Master Cmty. Ass'n v. Orlando Lake Forest Joint Venture*, No. 07-CA-1867-L, ¶ 4a (Fla. Cir. Ct. Apr. 20, 2010)).
[5] *Shlimovich v. Cheban*, 2013 WL 5211725, at *4 (Cal. App. 2d Sept. 17, 2013); *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *27 (W.D.N.Y. Mar. 26, 2013) (same).
[6] PD Ex. A at 20-21 (*Thereza Imanishi-Kari, Ph.D.*, DAB No. 1582 (Dep't of Health and Human Servs. 1996)).
[7] *Shlimovich*, 2013 WL 5211725, at *4 (Stewart "manipulated" evidence "to create a misleading appearance of nonalignment" in disputed document).
[8] PD Exs. A, B at 180. An NIH appellate panel dismissed his findings in a highly publicized case, finding Stewart improperly altered his working notes. *Id.* When confronted, Stewart admitted to doing the same in this case. PD Ex. G at 414:20-418:13.
[9] As to Q1 (a Nov. 17, 1997 fax from Brown's manager to Brown that discusses the then-contents of his *TWTC* script in detail), Stewart offered no test results. DN

on his PE testing, Stewart opined the Q2 and Q3 notebooks were fakes because, 3 of 60-plus samples of ink he took from the notebooks contained high levels of PE. DN 173 ¶ 169. What Stewart failed to disclose, however, is that the tests he ran all occurred on January 9, 2014—when he admits his machine was *contaminated with high levels of PE*, the very agent for which he was testing. Stewart contaminated the machine by purchasing the wrong type of chloroform, PD Ex. G at 392:16-393:13; "it wasn't until [January] 13th that the machine had been completely cleared," *id.* at 400:16-24; and all of his testing occurred on January 9, when contaminated. Stewart said, at 7:49 p.m., on January 9, when he tested Q1-Q3, there was still "a large amount of [PE] still in the machine." *Id*. at 400:7-19.

The fatal contamination in Stewart's testing comes as no surprise. He admits this was the *first time* he ever conducted a PE test on his own equipment for use in a case. *Id*. at 409:4-410:12. He only recently bought the machine because for the last 20 years, he opined PE testing was unreliable. *Id.* at 409:4-11, 411:3-6, 432:20-433:3. In 2012, he swore under oath there was "no way" PE testing could be done without knowing the original ink formula, PD Ex. E 294—which he admits not knowing here, PD Ex. G at 419:17-422:3. Given these flip-flops, and having contaminated his machine with the very agent for which he was testing, Stewart's opinions should be stricken. Indeed, plaintiffs never should have proffered them.

3. In addition to ink-dating tests, Stewart relies on searches of two websites, www.upcdatabase.com and the "Wayback Machine," to assert that the Q2 Dennison National Notebook was not on the market in 1997. He says Avery Dennison did not start selling such notebooks until 2002. DN 173 ¶¶ 53-54, 64. However, a simple Google search of the words on the cover of the notebook shows that it was on the market as far back as 1993. Indeed, an exact UPC code match of Q2 is archived in UCSF's "Tobacco Litigation Database."

---

123 at 42-44. The fax is powerful proof of *TWTC*'s prior creation, but defendants did not cite it in this motion, as they had not located it yet. DN 108 at 18.



| Notebook in UCSF Archives | Randy Brown's Notebook |

The notebook was produced in litigation in 2000 and contains dated entries on many pages from 1993. Pearl Decl. ¶¶ 2-5 & Exs. A & B. The UCSF notebook is Bates Numbered and resides in a comprehensive litigation database used by health researchers to investigate tobacco-related illness. *Id.* In addition, records from the USPTO show that Dennison National held a patent in spiral notebooks since 1983. *Id.* ¶ 6 & Ex. C. Stewart found none of these records because he conducted *no search* for products by "Dennison National"—*the company name* that appears on the front of Q2. PD Ex. G at 388:25-389-3. Instead, he relied on a UPC Database website, which he was told was "unreliable," *id*. at 389:20-391:13; 430:9-19. He admits his unorthodox method was never published, subject to peer review, or widely accepted in the scientific community. *Id*. at 391:4-8.

In attacking the Q3 notebook, Stewart declined even to consult the databases he used to assess Q2. *Id*. at 405:7-10; 408:4-7. Instead, he emailed a customer-service representative at Staples and asked her when Staples sold the spiral bound notebook at issue. *Id*. at 404:17-25. When she could not locate it in any catalog other than 2010—and said her records did not go "'that far back'"—Stewart

9

stopped his research and opined the notebook was fraudulent. *Id*. at 406:21-408:13. To be clear, Stewart wrote—in what he believed was his final draft report—that plaintiffs should obtain Staples' and Avery Dennison's business records to confirm his findings. *Id*. at 412:2-413:2. But plaintiffs' counsel deleted these paragraphs from Stewart's declaration, filed a version that omitted them, and affixed a pre-signed signature page to an earlier page of Stewart's declaration, cutting off this key paragraph in mid-sentence. *Compare* DN 123 ¶ 177; DN 173 ¶¶ 177-79.[10]

**B. Plaintiffs' Putative Computer Expert.** Reschke never wrote an expert report before this case and, when deposed, conceded he did not write large parts of the report he told the Court was his own. PD Ex. J at 644:11-645:6, 655:11-656:6, 677:11-678:15. Reschke has never testified about authentication of dates on floppy disks and could not answer basic questions about Macintosh technology (the subject of his testimony) without consulting Google or an undisclosed expert who ghostwrote much of his report (who in turn had to consult an unnamed Mac expert Reschke never met). *Id*. at 655:11-656:6, 675:15-676:13. Reschke's lack of expertise was no more apparent than when he issued his first report and *admittedly erred* in claiming that 1 of the script files on the 7 disks defendants submitted with this motion—which was *not* a *TWTC* file—was suspect. DN 71 ¶ 8; 130 ¶ 24. Reschke had no critique of the 10 *TWTC* script files on defendants cited. DN 110.

Last week, Reschke then asserted challenges to 2 of the 7 disks. DN 130. (The other five remain undisputed.) His first claim was that three <u>non</u>-*TWTC* files on one disk—*i.e.*, irrelevant files on which defendants never relied—had a pattern in the "file slack" that could be associated with overwriting. *Id*. ¶ 26. But at his deposition, he conceded this data was *not* an indicator of fraud. PD Ex. J at 670:23-673:15, 678:7-19. Reschke said a second disk was anomalous because of a

---

[10] Plaintiffs' putative handwriting expert (Hicks) offers no opinions, except to state that there is a "strong probability" that one person wrote Brown's Q2 and Q3 notebooks of *TWTC* notes (we agree, Brown did), and that two people *might* have written on Brown's computer disk labels, but he is not sure. DN 122 ¶¶ 3-4, 7-10.

purported *TWTC* "folder" on the disk with a 1993 creation date. DN 130 ¶ 54. At deposition, he conceded that the creation date of the "folder" could well have been the creation date of the disk—a manufacturer-given default. PD Ex. J at 663:5-666:2. Again, Reschke asked to confer with his two undisclosed Mac experts, who wrote large portions of his report, but are *never* disclosed in it. *Id.* at 664:11-19. Rule 702 does not allow such games, and Reschke's opinions should be stricken.[11]

**C. Brown's Press Interviews.** Plaintiffs assert that in press interviews in 2013, Brown conceded he wrote *TWTC* in 2003—*i.e.*, six years later than he sold it to the Bubble Factory. DN 120 at 17:1-24. While plaintiffs call this a "sea change" that defeats this motion, *id.*, they ignore two things: what Brown actually said, and the law. A reporter asked Brown: "This seems like a very personal project … that took *a long time* to come to fruition." Brown said: "I actually wrote the first draft *about 10 years ago* and had … Dustin Hoffman attached to star but that fell apart and I put it in my drawer for *a long, long time*." DN 133-3 at 4 (italics added). This rough approximation predates *Omaha* by three years. And even had Brown mixed up his dates (and he did not—he said "about" and a "long, long time"), cases like *Moore* make clear that such imprecisions are legally meaningless.[12]

**D. The Alleged *Moneyball* Scene.** Equally specious are plaintiffs' claims that *TWTC* must have been written in mid-2000s because of a scene in 1990s drafts that includes a "wireless laptop" and "high tech sabermetrics." DN 120 at 3:22-5:1, 17-19. As shown in defendants' pending *Daubert* motion, the 1990s scripts make no mention of a "wireless laptop," just a "laptop," DN 110 at 20:22-21:14, which

---

[11] Reschke's challenges to the other disks on which defendants did *not* rely in their motion are equally limited, irrelevant, and erroneous. We will address his and Stewart's reports, in full detail, in formal Rule 702 motions to strike. Based only on the above, however, their testimony can and should be disregarded.

[12] *See Moore v. Lightstorm Entm't*, 2014 WL 201579, at *4 & n.2 (D. Md. Jan. 17, 2014) (granting defendant summary judgment in *Avatar* motion picture case; plaintiffs' attacks on James Cameron's testimony, in which he confused his creation date as 1995 or 1996, were "frivolous" because no matter which was correct, plaintiff did not give Cameron his screenplay until 2003).

1  all admit was ubiquitous by 1997.  The only baseball stat noted in the actual *TWTC*
2  scene is "batting average," a stat that is 100 years old.  *Id.* at 21:15-22.  Last,
3  plaintiffs' claim that baseball teams did not use computers or sabermetrics to scout
4  until after *Moneyball* are refuted by article after article from the 1980s onward
5  citing such methods—all of which plaintiffs ignore.  *Id.* at 21:23-22:1, nn.4-6.

6      **E.  Script Registration.**  Plaintiffs say that Brown failed to register his
7  scripts with the Copyright Office or Writer's Guild and has "no explanation" for
8  this.  DN 120 at 21:16-25.  Brown had no legal duty to register the scripts, as
9  defendants showed in their motion, DN 98 at 13:25-147, nor any practical reason to
10 do so—the Bubble Factory optioned his script in well-documented legal contracts.

11     **F.  Legal Argument.**  Plaintiffs devote a page to the law, badly misstating it.
12 First, they say their experts must be viewed in a light most favorable, DN 120 at
13 23:15-19, but ignore that it is *their* burden to prove the experts meet the dictates of
14 Rule 702, which they cannot do, DN 110.  Second, they say defendants bear the
15 burden of proving that plaintiffs copied *Omaha*, DN 120 at 23:20-24:9, but that
16 would be true only if defendants sued plaintiffs for infringement or challenged their
17 copyright registration—neither of which is the case.  Last, plaintiffs mention 6 of
18 the 30-plus cases defendants cite to show why this case must be dismissed.  *Id.* at
19 24:10-25:5.  Plaintiffs say nothing about the many cases rejecting precisely the
20 expert opinions on which they rely.  And while they say defendants' cases are
21 distinguishable because *Omaha* and *TWTC* are "strikingly similar," they ignore that
22 they cannot meet, and never even tried to meet, this strict test.  DN 108 at 4.  Their
23 "experts" simply intoning the word "striking" over and over does not count.  *Id.*

24 **IV.  Conclusion**
25     The Warner Defendants' motion for summary judgment should be granted.

26 Dated:  February 7, 2014                   Respectfully submitted,
27                                                   O'MELVENY & MYERS LLP
28                                                   By:  /s/ Matthew T. Kline

OMM_US:72116113